Ziyad Abu EAIN, Petitioner-Appellant,

v.

Peter WILKES, United States Marshal for the Northern District of Illinois, Respondent-Appellee.

No. 80–1487.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1980.

Decided Feb. 20, 1981.

Rehearing and Rehearing En Banc Denied April 13, 1981.

---

Ramsey Clark, New York City, for petitioner-appellant.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for respondent-appellee.

Before PELL, Circuit Judge, SKELTON, Senior Judge,* and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioner Abu Eain is accused by the State of Israel of setting a bomb on May 14, 1979, that exploded during the afternoon in the teeming market area of the Israeli city of Tiberias,[1] killing two young boys[2] and maiming or otherwise injuring more than thirty other people. Israel seeks the extradition of petitioner from the United States. Petitioner, a resident of the West Bank area of the Jordan River, traveled to Chicago, Illinois via Jordan shortly after the Tiberias bombing incident. Pursuant to an extradition treaty between the United States and Israel, and in accordance with the federal statute governing American extradition procedure, 18 U.S.C. § 3184, a magistrate in the Northern District of Illinois after a hearing determined that defendant should be extradited to Israel to stand trial for murder, attempted murder and causing bodily harm with aggravating intent. Petitioner then sought a writ of habeas corpus from the district court (there being no provision for direct appeal) to prevent the Secretary of State from extraditing him in accordance with the magistrate's determination. The district court denied the writ. We affirm.

Petitioner contends that the evidence fails to establish probable cause to believe that he committed the crimes charged.[3] Alternatively, petitioner argues that if the evidence is sufficient to show probable cause, then the crimes of which he is accused do not fall within the terms of the treaty providing for extradition. Petitioner claims that it is apparent that the bombing was politically motivated and that political offenses of that kind are excepted from the extradition treaty. Petitioner further contends that if the bombing was not within the political offense exception, then Israel's "indictment" of him for the alleged crimes amounts only to a subterfuge in order to have him returned for trial, not for the alleged offenses, but instead for the political offense of membership in the Al Fatah branch of the Palestine Liberation Organization (PLO).[4]

## I. The Process of Extradition

The Extradition Treaty between the United States and Israel became effective in 1963. 14 U.S.T. 1707. Article II of that Treaty provides, *inter alia*, for extradition of persons accused of murder and infliction of grievous bodily harm, as well as attempts to commit those crimes. Article V of the Treaty provides that a person may be extradited only if the evidence is "found sufficient, according to the laws of the place where the person sought shall be found ... to justify his committal for trial if the offense of which he is accused had been committed in that place...." This form of treaty provision has been held to require a finding of probable cause under federal

* Senior Judge Byron G. Skelton of the United States Court of Claims is sitting by designation.

1. Tiberias is a popular resort town on the west coast of the Sea of Galilee.

2. At the time Tiberias was unusually crowded with young people gathering for a youth rally.

3. Originally petitioner contended that he was not the person charged in Israel. The government presented fingerprint and photographic evidence identifying petitioner as being the person both charged and sought to be extradited. The identity issue has not been raised on appeal by petitioner.

4. For purposes of this opinion, we will refer to both the Palestine Liberation Organization and Al Fatah by the initials "PLO."

law. *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

As an exception to the foregoing Treaty provisions, Article VI, paragraph 4 of the Treaty states that extradition shall not be granted "[w]hen the offense is regarded by the requested Party as one of a political character or if the person sought proves that the request for his extradition has, in fact, been made with a view to trying or punishing him for an offense of a political character."

Since the technical aspects of extradition procedure are not explicitly stated in the Treaty, this country's laws guide the manner in which a decision is made whether or not an individual may be extradited from this country to Israel. We briefly discuss the provisions of the laws of the United States concerning extradition since the arguments of both petitioner and the government on the facts of this case and their contentions on what the law requires can best be understood in the context of overall extradition procedure which varies from the common interstate process.

The procedure in the United States for extradition is governed by 18 U.S.C. §§ 3181–3195. In brief, the statutes require that a country seeking extradition of an individual submit to our government through proper diplomatic channels a request for extradition. That request must in general be supported by sufficient evidence to show that the individual is the person sought for the crimes charged, that the crimes are among those listed as extraditable offenses in the Treaty and that there is sufficient justification for the individual's arrest had the charged crime been committed in the United States. After evaluation and approval by the Department of State, the necessary papers may be forwarded to the United States Attorney in the district where the person sought to be extradited may be found. The United States Attorney may then file a complaint and seek an arrest warrant from a magistrate. If a warrant issues the magistrate then conducts a hearing under 18 U.S.C. § 3184 to determine "[i]f, on such hearing, [the magistrate] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention...." The Federal Rules of Evidence and Criminal Procedure do not apply in such a hearing. Fed.R.Evid. 1101(d)(3); Fed.R.Crim.Proc. 54(b)(5). It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing. The person charged is not to be tried in this country for crimes he is alleged to have committed in the requesting country. That is the task of the civil courts of the other country.

Under § 3184, should the magistrate either determine that the offense charged is not within a treaty's terms or find an absence of probable cause, the magistrate cannot certify the matter to the Secretary of State for extradition. If the case *is* certified to the Secretary for completion of the extradition process it is in the Secretary's sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender. *See* 4 G. Hackworth, Digest of International Law, § 316, pp. 49–50 (1942); Note, *Executive Discretion in Extradition*, 62 Colum.L.Rev. 1313, 1323 (1962).

The government cannot take a direct appeal from the magistrate's decision *not* to certify the case. There also is no statutory provision for direct appeal of an adverse ruling by a person whose extradition is sought. Instead, that person must seek a writ of habeas corpus. *Collins v. Miller*, 252 U.S. 364 (1920); *Greci v. Birknes*, 527 F.2d 956 (1st Cir. 1976). The scope of habeas corpus review in extradition cases is a limited one, according due deference to the magistrate's initial determination. *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925). *See In the Matter of Assarsson*, 635 F.2d 1237 (7th Cir. Oct. 31, 1980); *Laubenheimer v. Factor*, 61 F.2d 626 (7th Cir. 1932); *Ornelas v. Ruiz*, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896). The district judge is not to retry the magistrate's case.

"[H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there is *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. at 312, 45 S.Ct. at 542 (per Holmes, J.) (emphasis supplied). The magistrate is obliged to determine whether there is probable cause to believe that an offense was committed and that the defendant committed it. 18 U.S.C. § 3184; *Benson v. McMahon*, 127 U.S. 457, 462–63, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888); M. C. Bassiouni, International Extradition and World Public Order 516–18 (1974) (hereinafter cited as "Bassiouni"). The extradition process has not been challenged in this case by petitioner, but the government has raised a question about the scope of the magistrate's authority.

## II. Probable Cause

Petitioner first challenges the sufficiency of the evidence to sustain the magistrate's finding of probable cause. Our scope of review on this issue is limited to determining whether there is "any evidence" to support the magistrate's finding of probable cause. We conclude that the magistrate's determination was supported by sufficient evidence.

Petitioner's hearing before the magistrate lasted seven days. During the hearing sworn statements of Jamil Yasin, Mufida Jaber and Israeli Police Captain Peretz were introduced as evidence. The admissibility of those exhibits was not challenged by petitioner.

According to Yasin's statement, Yasin and petitioner traveled to Tiberias on May 11, 1979 for "reconnaissance" purposes in connection with their membership in the PLO. The two men were scouting for a location in which to place a bomb. On May 14, the celebration day of Israel's Independence, Yasin prepared an explosive charge which he gave to petitioner with an explanation as to its operation. Petitioner left Yasin's home for Tiberias at 9:00 a. m. on

May 14 with the charge, and returned about 4:30 p. m. Petitioner went alone to Tiberias because he was concerned that Yasin might be recognized since "there were many people who knew [him]." Government Exhibit 1, "Statement by Yasin." Yasin gave petitioner instructions to place the bomb in a public area, and cautioned him to avoid military vehicles. On his return from Tiberias, petitioner told Yasin that he put the charge in a refuse bin in the center of town. The next day, May 15, Yasin met with petitioner and told him of news reports of the bomb's explosion in Tiberias, stating "the operation had succeeded." The substance of those events was also supported by the statement of Captain Peretz, the head of a special Israeli police team investigating the bombing. On May 17, 1979 Yasin, according to his statement, sent a letter to petitioner which was delivered by Yasin's cousin, Mufida Jaber. Yasin sent the letter after hearing that a person named "Ataf" had been arrested. In her sworn statement Mufida Jaber describes the contents of the note as: "To Ziyad, Talila, Jan and Umm Ammar, has been caught. Be careful." (Petitioner is known by the names Ziyad and Talila.) After reading the message, petitioner told Jaber that he wanted to go to America through Amman, Jordan. On May 20, 1979 petitioner obtained a visa to the United States, and on June 5 he crossed into Jordan with an Israeli transit permit, arriving in Chicago, Illinois, on June 14, 1979. In Chicago, petitioner took up residence with his sister and her husband, Ahmad Yusuf.

On August 17, 1979 agents of the Federal Bureau of Investigation (FBI) went to Yusuf's residence with a warrant for the arrest of petitioner. The agents advised those present of the warrant, mistakenly stating that the request for petitioner's arrest came from Jordan, not Israel. Petitioner was present but lied to the agents about his true identity, giving the name of Kamal Yusuf. At the agents' request, petitioner and another man who was also present accompanied the agents to the FBI field office, where both were fingerprinted and photographed before being taken back

to Yusuf's. The FBI subsequently received fingerprints from Israel which matched those taken from "Kamal Yusuf," who was in fact the petitioner. The agents returned to the Yusuf residence on August 22, 1979 to arrest petitioner, but he was no longer there. When informed of the legal consequences of harboring a fugitive, Ahmad Yusuf, petitioner's brother-in-law, who first claimed he did not know where petitioner was, made telephone calls, one in Arabic and one in English, in the second of which he was heard to say he wanted petitioner to come to his apartment to talk with Yusuf's attorney. A short time later petitioner arrived and was placed under arrest. In transit to the FBI office, petitioner said to one of the agents, "It's the Israeli's, not the Jordanians that want me." Up to that point the FBI agents had not informed petitioner of their earlier mistake regarding the country requesting the warrant, but then confirmed that the petitioner was correct about which country sought his extradition.

As noted earlier, Article V of the extradition Treaty provides that "Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, ... to justify his committal for trial...." The first crucial question here, then, is whether evidence introduced at the hearing is sufficient to support the magistrate's finding of probable cause.

■ In this case we have the statement of Yasin, an accomplice, that petitioner planted the bomb in Tiberias. Although in this circuit we advise a jury to give accomplice testimony such weight as is felt it deserves and to consider it with caution and great care, accomplice testimony is nevertheless competent to support a finding of probable cause. Federal Criminal Jury Instructions, Seventh Circuit 1980, 3.22 Accomplice Testimony. Such evidence may be of particular importance in extradition cases where all the alleged criminal activity occurred in a distant country. In *Curreri v. Vice*, 77 F.2d 130, 132 (9th Cir. 1935), the court, in the context of an extradition proceeding, stated that "the testimony of an accomplice is, next to the confession of the defendant, the most satisfactory kind of evidence that can be produced as to the guilt of the defendant." An accomplice's accusations are not automatically incompetent to support a determination of probable cause, as petitioner would have it.[5]

■ Yasin's statements inculpated both himself and petitioner in the commission of the bombing. Yasin's statements were admissions against his own penal interest and are deemed reliable. *United States v. Harris*, 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971); *United States v. Boyce*, 594 F.2d 1246, 1249 (9th Cir. 1979). The prejudice to Yasin in making the statement strengthens its supportive character.

■ Quite apart from the prejudice to Yasin and his knowledge of the events of the bombing and petitioner's departure, there are additional reasons for crediting the accomplice's statements. The statement of Captain Peretz corroborates Yasin's statements as to the cause, timing, place and occurrence of the explosion in Tiberias. Mufida Jaber's statement corroborates Yasin as to Yasin's communication to petitioner that they were in danger, and petitioner's subsequent departure to the United States. Where an accomplice's testimony is corroborated by further facts there is sufficient evidence to find probable cause. *United States v. Harris, supra; United States v. Boyce, supra.*[6]

---

5. The uncorroborated testimony of an accomplice has been held sufficient to support even the higher reasonable doubt standard necessary for a criminal conviction. *Suhl v. United States*, 390 F.2d 547 (9th Cir. 1968) (testimony of accomplice sufficient even though inconsistent with only evidence connecting defendant with offense). *See United States v. Lee*, 506 F.2d 111 (D.C.Cir.1974) (conviction may rest solely on uncorroborated testimony of an ac-

complice); *United States v. Green*, 446 F.2d 1169 (5th Cir. 1971) (no absolute rule of law preventing convictions on the testimony of an accomplice).

6. The issue of corroboration generally arises in the context of search warrants; however, the same standards are applicable to the issuance of an arrest warrant. *See Giordenello v. Unit-*

Furthermore, Yasin's statements are corroborated by the acts of petitioner himself. When first asked his identity by FBI agents, petitioner gave a false name, thereby concealing his identity and, at least temporarily, evading arrest. When subsequently apprehended, petitioner, unprompted, advised FBI agents that it was the Israelis rather than the Jordanians that issued the warrant for him. That petitioner concealed his identity and moved to a different address in Chicago permits an inference of his guilt. Flight also is a legitimate ground from which to infer guilt and here, at the least, lends itself to use as corroboration of Yasin's statement in the consideration of probable cause. *See Rowan v. United States,* 277 F. 777 (7th Cir. 1921) (evidence of flight admissible since its probative value is to indicate a consciousness of guilt); *Kanner v. United States,* 34 F.2d 863, 866 (7th Cir. 1929) (evidence of flight and assumption of false name admissible); *United States v. Dalhover,* 96 F.2d 355, 359 (7th Cir. 1938); *Currie v. Vice,* 77 F.2d 130, 133 (9th Cir. 1935); *United States v. Heitner,* 149 F.2d 105, 107 (2d Cir. 1945); *Green v. United States,* 259 F.2d 180, 182 (D.C.Cir. 1958). That petitioner likewise knew it was the Israelis who sought him also tends to support some inference of guilt. On these facts, the statements of Yasin, an accomplice, corroborated by statements of an investigating police officer and Yasin's cousin, Jaber, and by inferences that may be drawn from petitioner's own conduct of concealment and flight are sufficient to support the magistrate's finding of probable cause.

Appellant contends that the magistrate erred by refusing to admit statements in which Yasin and Jaber allegedly recanted their earlier statements regarding petition-

er's role in the bombing. We disagree. An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof. *Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.), *cert. dismissed,* 414 F.2d 884 (1973). To do otherwise would convert the extradition into a full-scale trial, which it is not to be. "[T]he extradition proceeding is not a trial of the guilt or innocence [of petitioner] but of the character of a preliminary examination...." *Jimenez v. Aristeguieta,* 311 F.2d 547, 556 (5th Cir. 1962). The inculpatory statements of Yasin and Jaber were made before an Israeli police officer. The statements were transcribed in Hebrew and were subsequently sworn to be true and correct before an Arabic speaking judge of the Magistrate's Court of Jerusalem. The judge conversed with Yasin and Jaber in their native Arabic and determined that the witnesses understood their statements and that the statements were made of their own free will.[7] Petitioner's offer of proof, which was rejected by the magistrate, consists of declarations by Yasin and Jaber in which each recants prior detailed testimony implicating petitioner in the bombing. These declarations were made to private counsel while Yasin and Jaber were being held in prison. Both Yasin and Jaber declared that the inculpatory statements were made under the mistaken belief that petitioner could not be harmed by the statements because he was outside the country. The later statements do not explain the government's evidence, rather they tend to contradict or challenge the credibility of the facts implicating petitioner in the bombing. Therefore, the magistrate properly decided that such a contest should be resolved at trial in Israel.[8] The alleged recantations

---

ed States, 357 U.S. 480, 485–86, 78 S.Ct. 1245, 1249, 2 L.Ed.2d 1503 (1958).

7. We find no merit in petitioner's suggestion that the confessions were inherently suspect by virtue of being transcribed in Hebrew as opposed to the declarants' native Arabic. The magistrate considered this fact along with statements by Judge Shabtay of the Magistrate's Court of Jerusalem that he questioned

Yasin and Jaber in Arabic and determined that they understood their statements and made them of their own free will.

8. Petitioner relies on *Application of D'Amico,* 185 F.Supp. 925 (S.D.N.Y.1960), for a rule that evidence that an accomplice has recanted his testimony is always admissible in an extradition proceeding because the probative value of such testimony is "thin." However, petition-

are matters to be considered at the trial, not the extradition hearing.

▋ Petitioner also challenges the magistrate's rejection of statements claiming that petitioner was in Ramallah on the day of the bombing. This evidence directly contradicts the government's proof that petitioner placed a bomb in a trash bin in Tiberias on the same day. "[E]vidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing." *Shapiro v. Ferrandina*, 478 F.2d at 901 (1973). Thus, the magistrate in the case before us correctly refused to admit the evidence.[9] This evidence also is a matter for consideration at the trial, not the extradition hearing.

### III. Treaty Construction

Because petitioner's remaining arguments implicate political concerns, it is essential that we explore the significance to extradition of crimes arising in a political context. Most treaties list categories of crimes or specific offenses for which extradition may be requested. There usually are, however, exceptions to the crimes contained in the list. Many treaties include "political crimes" among those exceptions. The traditional extradition treaty language that deals with the political context of crimes excepts from the treaty crimes that are "of a political character." The Treaty involved in this case uses the traditional

language, and like most other similar treaties does not further define its terms.

Petitioner notes that courts around the world have recognized analytically separate kinds of political offenses, termed "pure" and "relative." A "pure" political offense is an "act that is directed against the state but which contains none of the elements of ordinary crime," such as sedition, treason and espionage. Garcia-Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law*, 48 Virginia L.Rev. 1226, 1230, 1237 (1962) (hereinafter cited as "Garcia-Mora"). A "relative" political offense is one "in which a common crime is so connected with a political act that the entire offense is regarded as political." *Id.* at 1230–31. Petitioner argues that he should not be extradited because the crime with which he is charged constitutes a relative political offense, and that the political overtones of the act outweigh the elements of common crime. The government, in addition to disputing petitioner's argument, urges this court to hold that the determination of the political nature of the crime is itself a political question which should be the sole responsibility of the "political branches" (i. e., Congress and the Executive) [10] to decide, not the Judicial branch. The government also contends that the Treaty itself places sole authority to make the determination of a "political offense" in the hands of the Executive. It therefore becomes necessary to interpret the meaning of the "political offense" exception.

er's characterization of the decision in *D'Amico* is inaccurate. In that case the evidence of recantation already had been admitted by the magistrate. The district court on habeas corpus review had no opportunity to consider whether or not the evidence of recanting was properly on the record, and therefore made no determination on the issue. The district court in *D'Amico* remanded the case to the magistrate because it was unclear whether or not the magistrate had made a specific determination on the issue of probable cause.

9. Petitioner also urges that reports alleging torture in Israeli prisons should have been admitted to explain the circumstances of Yasin's confession. Petitioner offered no proof that Yasin himself suffered any mistreatment. We are asked to take judicial notice that Israel routinely tortures prisoners, an invitation we

decline. Judicial notice could be taken only of a matter not reasonably subject to dispute and which is generally known to the court, or otherwise is capable of accurate and ready determination by sources that cannot reasonably be questioned. *Cf.* Fed.R.Evid. 201 (judicial notice in contexts other than extradition). We note that the reports of various organizations which petitioner brings to our attention were not themselves all unanimous in their findings; some contain both majority and minority conclusions. No aspect of this situation lends itself to judicial notice. *See generally*, W. Hurst, Statutes In Court 89–96 (1970).

10. *See Chicago & Southern Airlines v. Waterman Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

### A. Authority to Determine Extradition Issues as a Matter Within Sole Discretion of Political Branches

The government's argument that the Political Branches should decide the question of whether the crime charged is a "political offense" under the Treaty has no basis in United States case precedent.[11] The government's contention, however, points up an apparent anomaly in the American law of extradition. It is the settled rule that it is within the Secretary of State's sole discretion to determine whether or not a country's requisition for extradition is made with a view to try or punish the fugitive for a political crime, i. e., whether the request is a subterfuge. *In re Lincoln*, 228 F. 70 (E.D.N.Y.1915), *aff'd per curiam*, 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916); Note, *Executive Discretion in Extradition*, 62 Colum.L.Rev. 1313, 1323 (1962). In contrast, the Judicial branch has consistently determined whether or not the "political offense" provision applies to the crime charged, presumably relying upon the language in 18 U.S.C. § 3184. That section requires a hearing to determine whether there is sufficient evidence "to sustain the charge *under the provisions* of the proper treaty." (Emphasis supplied.)[12] We have not found any case where an American court declined to consider the applicability of the political offense exception when it was squarely presented. If anything, one of the major criticisms leveled at American extradition law is that federal courts have tended to invoke the political acts exception in situations of common crimes mixed with political overtones upon a showing of "any connection, however feeble" to an uprising or rebellion or condition of domestic violence. *See* Garcia-Mora at 1244; I. A. Shearer, Extradition In International Law 171 (1971) (hereinafter referred to as "Shearer").

Congress originally made the determination that it is for the courts to decide how to apply the exception by making it a Judicial determination in the first instance as to whether or not the country requesting extradition had charged an individual with a crime "under the provisions of" a treaty. The Executive branch has, over the years, implicitly endorsed this approach.[13] The present system of American extradition perhaps may have evolved as a way of providing the Executive some flexibility in decision-making by allowing it to defer to the Judiciary's decision, for example, to refuse extradition of an individual who the Secretary of State is reluctant to extradite anyway. This "permits the Executive Branch to remove itself from political and economic sanctions which might result if other nations believe the United States lax in the enforcement of its treaty obligations." Lubet & Czaczkes, *The Role of the American Judiciary in the Extradition of Political Terrorists*, 71 J.Crim.L. & Criminology 193, 200 (1980) (hereinafter cited as "Lubet & Czaczkes"). *See* Shearer at 192; Note, *Bringing the Terrorist to Justice: A Domestic Law Approach*, 11 Cornell Int'l L. J. 71, 74 (1978). With this background in mind, we consider whether the issues involved in applying the political offense ex-

---

11. The only case with any similarity which we have found that permits the Executive to make the initial determination in extradition matters that the crime charged was committed and that the person sought to be extradited committed it, *Sayne v. Shipley*, 418 F.2d 679 (5th Cir. 1969), involved a treaty that implicated the "special relationship between the Canal Zone and the Republic of Panama." *Id.* at 686. The court indicated, however, that any Executive determination to extradite still would be subject to review on habeas corpus.

12. A clause excepting political offenses is a "provision" of the treaty. *See generally* cases cited in Note, 62 Colum.L.Rev. at 1322, nn. 73,

74. *Compare Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (habeas corpus available to determine "whether the offense charged is within the treaty").

13. Prior to the enactment of the original version of 18 U.S.C. § 3184, the Executive exercised complete control over extradition without reference to the courts. Bassiouni at 505. Thus, from 1794 to 1842 the Executive had unfettered discretion in this area. Immediately upon the statute's enactment, the Executive began a policy of deference to the role of the Judiciary as mandated by Congress. *See* 4 Op. Att'y Gen. 201 (1843).

ception are such that only the Executive should make the determination.

The government does not direct our attention to a specific constitutional provision that could be invoked to guide a resolution of this issue which, the government says, does not lend itself to judicial application. See L. Tribe, American Constitutional Law 75 (1978) (hereinafter referred to as "Tribe"). Instead, the government emphasizes the constitutional commitment of foreign policy and international affairs decisions generally to the Executive, and suggests that the political nature of those areas renders them unsuitable for judicial consideration. But, as the Supreme Court has said, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial competence." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). This court must decide whether the present case contains elements of foreign policy that do lie beyond judicial competence, and if so, whether that justifies a rule that precludes judicial consideration of similar treaty provisions in all cases.

We disagree with the government's argument relying on *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710, that construing application of a treaty's political offense exception clause requires "an initial policy determination of a kind clearly for nonjudicial discre-

tion." It is clear that courts have authority to construe treaties. See Tribe at 76, n. 35. In the absence of an Executive determination that a treaty has been terminated, a court may consider the issues raised when it is asked to apply the treaty: the Court "can construe [the] treaty and may find it provides the answer." *Baker v. Carr*, 369 U.S. at 212, 82 S.Ct. at 707. See J. Nowak, R. Rotunda & J. N. Young, Constitutional Law 104 (1978); L. Henkin, Foreign Affairs And The Constitution 210–16 (1972).

■ The government stresses the unique resources available to the Executive to aid its determination of the political situation in foreign lands. But the State Department can and has made it a practice to share that information with courts during extradition proceedings. *Cf.* Baldwin, *The Foreign Affairs Advice Privilege*, 1976 Wisconsin L.Rev. 16 (Secretary of State may withhold certain foreign affairs information from Congress). In extradition proceedings involving the political crime exception, one of the major questions for the magistrate is whether there existed violent political turmoil at the site and time of an individual's alleged illegal activities. The existence of a violent political disturbance is an issue of past fact: either there was demonstrable, violent activity tied to political causes or there was not.[14] The resources to make

---

**14.** This distinguishes the cases cited by the government that confer sole discretion on the Executive to determine when a state of war or belligerency exists in another country. *In re Cooper*, 143 U.S. 472, 12 S.Ct. 453, 36 L.Ed. 232 (1892); *The Three Friends*, 166 U.S. 1, 17 S.Ct. 495, 41 L.Ed. 897 (1897); *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). In those situations a court would be unable definitively to say that a specific level of hostility had been reached. When considering the political offense exception, a court need consider only whether some incidents of political violence have occurred, and not whether the violence has risen to a particular level. We note especially the following language from *In re Cooper*:

> We are not to be understood, however, as underrating the weight of the argument that in a case involving private rights, the court may be obliged, if those rights are dependent upon the construction of acts of Congress *or of a treaty*, and the case turns upon a ques-

tion, public in its nature, which has not been determined by the political departments in the form of a law specifically settling it, or authorizing the executive to do so, to render judgment, "since we have no more right to decline the jurisdiction which is given than to usurp that which is not given."

143 U.S. at 503, 12 S.Ct. at 460 (emphasis supplied). The question, then, is not so settled as the government suggests, since there is no extradition statute specifically authorizing the Executive to make the determination whether the political offense exception applies, nor is there a statute defining the term.

We also note that *The Three Friends* case makes specific mention of the numerous legal consequences of declaring a "state of belligerency," which include impacts on the conduct of commerce and even the war power, 166 U.S. at 63, 17 S.Ct. at 502. We emphasize that there has been no showing that such broad legal consequences would obtain in the case before

that initial determination can ordinarily be sufficiently produced for judicial consideration. *In camera* review is available for sensitive evidence. In this case an assistant legal advisor for the State Department's Office of Combating Terrorism, an authorized spokesman for the Department, did appear and testify. Mr. Fields explained that "It is the view of the Department of State that indiscriminate use of violence against civilian populations, innocent parties, is a prohibited act, and as such, is a common crime of murder, punishable in both states." There was additional evidence offered by the Department of State concerning the positions consistently taken by our high government officials in regard to terrorism. The official Executive view was made known to the magistrate. Even though we do not leave sole determination to the Executive branch, we believe its views are entitled to great weight in extradition matters.

The government also expresses concern over the possibility that a court's pronouncements on certain subjects may conflict with the Executive's and embarrass this country's conduct of its foreign policy. In particular, the government points to petitioner's claim that in order to consider the political aspects of his alleged actions a court must "recognize" the PLO as a legitimate political group, a position the United States has not taken. We agree with the government when it says "[t]hat decision should only be made by those directly responsible for overseeing our foreign relations." However, the formulation of the political offense exception does not require any such "recognition." It requires only the recognition that there occurred violent acts and political tensions that resulted in the charged criminal acts. That determina-

tion does not give rise to a direct conflict: in most cases there is no real contention about the existence *vel non* of political violence in the requesting country.

The government's concerns seem directed to whether the Judiciary will recognize a given sort of violence as falling within the protection of the political offense exception, thus implicitly conferring on certain actions a status with which the Executive might disagree. We point out that the Judiciary's conclusions may differ from the Executive's in many areas of law, yet that does not mean that whenever the courts might disagree with the Executive the issue thereby becomes a non-justiciable "political question." [15] To some extent, "all constitutional interpretations have political consequences," R. Jackson, The Supreme Court In The American System 56 (1955), and indeed the same follows from any treaty interpretation. We recognize the need for special sensitivity in areas such as our government's foreign relations conduct, but that sensitivity does not preclude the Judiciary from having a part in the process of determining whether the political offense exception applies. That determination involves an approach to factfinding that is traditional to the courts.

■ We also disagree with the government's argument that there are no judicially discoverable and manageable standards to guide the court's discretion. For better or worse, the extradition statute requires the magistrate to determine that the crime alleged is listed in the applicable treaty, and that the provision of the treaty relating to political offenses does or does not apply. Before an act may constitute a political offense, there must be two basic determina-

us upon a finding that political upheaval is occurring in Israel.

15. We also note that the Judiciary has made numerous decisions that touch our nation's domestic and foreign policy concerns and implicate matters that traditionally are thought of as Executive functions—on occasion to the chagrin of the latter branch. *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (permitting publi-

cation of Pentagon Papers in face of argument of threat to relations with allies); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (restricting Executive discretion against claim of necessity to further international military policy). *See also Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (appraisal of international tensions and conditions in evaluating constitutionality of statute).

tions made by the magistrate: that there was a violent political disturbance in the requesting country at the time of the alleged acts, and that the acts charged against the person whose extradition is sought were recognizably incidental to the disturbance. The magistrate's *legal* determination that a person is extraditable does not bind or control the Secretary's later *political* conclusion. *In re Ezeta*, 62 F. 972 (N.D.Cal.1894). On the other hand, if the magistrate concludes that the individual is not extraditable, it is up to the Secretary to decide whether or not to pursue the issue before another magistrate, as in *In re Gonzalez*, 217 F.Supp. 717 (S.D.N.Y.1963). The Secretary, it appears, contrary to general practice, has been permitted to shop for a more receptive magistrate.

In order to assure that there is adequate protection of the rights of an individual whose extradition is requested, "[p]urely as a practical matter it would seem reasonable for the courts of this country to make an initial finding of extraditability of particular offenses." *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). As Judge Friendly stated in the *Shapiro* case, "we see little reason why a prior judicial determination would be viewed by [the Secretary of State] as an unwarranted intrusion upon executive power." *Ibid.* See Sharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 584 (1966) (courts are cautious about invoking political question doctrine where important individual rights are at stake). *Cf.* Kutner, *World Habeas Corpus and International Extradition*, 41 U.Toledo L.J. 525, 532 (1964) (Secretary of State's power of ultimate determination not to extradite, despite court certification, shows latitude democracy allows in concern for individual rights).

The government stresses that courts have refused to look at the requesting country's motives to determine if extradition for a common crime is sought merely as a subterfuge for trying an individual for political crimes, *see Garcia-Guillern v. United States*, 450 F.2d 1189 (5th Cir. 1971), even in the presence of an express provision of the treaty, such as the one in the Treaty before us. This raises the logical question of why the Executive's authority is "virtually untrammelled" [16] in that area, but is subject to an initial decision by the Judiciary on the applicability of the political offense exception.

The different approaches taken on political offense and "subterfuge" issues are not so anomalous as the government suggests. In considering the presence of a political offense, the court determines whether the crime charged stemmed from political violence. To make that determination, the magistrate need look only to the facts supporting the extradition request for evidence as to whether or not violent political activity was unfolding at the time to which the facts relate, and of the individual's recognizable connection to that violence. Compared to that, evaluations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion. The Executive's evaluation would look at the actual operation of a government with which this country has on-going, formal relations evidenced by the extradition treaty and imply that the government may be disingenuous. This obviously would be an embarrassing conflict over assumptions essential to our foreign relations about the integrity of governments with which the United States deals. A judicial decision, however, that establishes an American position on the honesty and integrity of a requesting foreign government is distinguishable from a judicial determination that certain events occurred and that specific acts of an individual were or were not connected to those events. The latter type of decision simply categorizes the facts involved in a given case and then construes the treaty to determine whether or not the facts fall within its ambit. Thus, the Judiciary's deference to the Executive on the "subterfuge" question is appropriate since political questions

---

**16.** Note, *Executive Discretion in Extradition*, 62 Colum.L.Rev. 1313, 1323 (1962).

would permeate any judgment on the motivation of a foreign government.[17]

It should be emphasized, however, that the government's argument on this point is not without some merit. If our long established extradition process is thought to need some overhauling, it is for the Congress to consider, not the courts.

**B. Treaty Language: Discretion to Determine Political Nature of Offense Within Sole Discretion of Executive Branch**

The government argues that the Treaty, by its own terms, leaves to the sole discretion of the Executive branch the determination whether or not an alleged act for which extradition is sought is of a political nature. In support of its argument, the government cites the text of the Treaty: "Extradition shall not be granted ... When the Offense is regarded *by the requested Party* as one of a political character...." Art. VI, par. 4 (emphasis added). The government contends that the words "requested Party" refer only to the Executive branch, citing *Berenguer v. Vance*, 473 F.Supp. 1195 (D.D.C.1979). We conclude that the *Berenguer* case is inapposite and that the government's contention lacks sufficient merit to justify a holding in its favor on this issue.

In *Berenguer*, Italy had obtained Berenguer's extradition from the United States through normal channels for trial on certain defined crimes. Once Berenguer was in Italy, that country asked the State Department to expand the list of charges for which he could be tried. This request was necessary because a principle of international law known as the "doctrine of specialty," which was explicitly incorporated in the treaty, states that the requesting country must seek permission of the "requested Party" before prosecuting or punishing an extradited party for any offense committed prior to extradition, except that for which he was extradited. Berenguer claimed that the State Department could not acquiesce to an extension of the original charges absent a new hearing before an American magistrate. The district court disagreed, noting that once Berenguer was lawfully extradited and had arrived in Italy he was no longer subject to the jurisdiction of United States courts and his American due process rights no longer controlled his case. 473 F.Supp. at 1198. Expansion of the list of crimes for which he could be tried became a matter of state to be decided by the Executive branches of the two nations. That court also noted that the language of the treaty did not specify a procedure to guide the decision on expanding the list of crimes for which Berenguer could be tried. Thus, the district judge held that the decision was left to the State Department. To that limited extent, the government is correct when it argues that the district court in *Berenguer* held that the term "requested Party" refers to the Executive branch, since there was an absence of statutory or treaty language "requiring a second judicial hearing once extradition has been accomplished." *Id.* at 1197. But the court in *Berenguer* explicitly noted that *before* extradition is accomplished, there must be a hearing before a magistrate to determine whether there is probable cause to believe the person committed a crime for which he could be extradited under the terms of the treaty. *Id.* at 1196.[18] The district court's

---

17. *Compare* the "Act of State" concept, which says that "the courts of one nation will not sit in judgment on the acts of the government of another done within [the latter's] own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed.2d 456 (1897).

18. *Compare Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978), where the court says the extradition hearing is limited, *inter alia*, "merely to ascertain whether a treaty applies...." The government cites both the *Sabatier* and *Berenguer* opinions in support of the

argument that the courts may only make a determination on the issue of probable cause, which in the government's view excludes judicial application of the political offense exception. As we discuss in an earlier part of this opinion, it has been the law of extradition in this country that the probable cause hearing comprehends a determination that the crime charged is one "under the provisions of" the treaty (*i. e.*, that it is not a political offense). 18 U.S.C. § 3184. While the portion of the *Sabatier* opinion quoted in this footnote, if read alone, may be construed to support the govern-

careful distinction in that case between extradition decisions made before and after actual extradition counsels against our expanding the *Berenguer* holding to read the term "requested Party" in extradition treaties as always referring solely to the Executive branch.

As the district court stated in *Berenguer*, one constant in American extradition law is that the magistrate is to make the initial determination in the extradition process. We hesitate to hold on so slim a record as is available on the intent of the drafters of the Treaty in this case that the major "procedural safeguards established to protect the defendant's rights" in extradition, *id.* at 1198, have been deliberately written out of the document, although the treaty language lends some support to that interpretation. Our caution is reinforced when we note that the only case we have found that holds the Executive branch entitled to make the initial extradition decision subject only to later habeas corpus review, *Sayne v. Shipley*, *supra* n.11, did so in the narrow context of an extradition treaty arising from the "special relationship between the Canal Zone and the Republic of Panama." 418 F.2d at 686. No similar "special relationship" exists between the countries who are parties to the Treaty before us.

## C. Extradition Request as a Subterfuge

■ Petitioner claims that Israel seeks his extradition on charges of common crimes in order to try him for his political beliefs. Thus, he says, he should not be extradited, even though all proceedings in Israel concerning this case have been conducted in civil, not military, court.

The determination in this case whether or not the request for extradition on common crimes amounts to a subterfuge by Israel to punish petitioner for a political offense is, as we have clearly noted, a decision within the sole province of the Secretary of State. *Laubenheimer v. Factor*, 61 F.2d 626 (7th Cir. 1932); *In re Lincoln*, 288 F. 70 (E.D.N. Y.1915), *aff'd per curiam*, 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916); *Sindona v. Grant*, 461 F.Supp. 199 (S.D.N.Y.1978). As should be clear from our earlier discussion, petitioner's claim is without merit, since this court has no jurisdiction to determine the requesting country's motives under this Treaty.

## IV. Political Offense Exception

■ The operative definition of "political offenses" under extradition treaties as construed by the United States limits such offenses to acts committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion. Shearer at 178–81; Cantrell, *The Political Offense Exemption in International Extradition: A Comparison of the United States, Great Britain and the Republic of Ireland*, 60 Marquette L.Rev. 777, 795–97 (1977) (hereinafter referred to as "Cantrell"); *Escobedo v. United States*, 623 F.2d 1098 (5th Cir.), *cert. denied*, ── U.S. ──, 101 S.Ct. 612, 66 L.Ed.2d 497; *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980); *Ramos v. Diaz*, 179 F.Supp. 459 (S.D.Fla.1959); *In re Ezeta*, 62 F. 972 (N.D.Cal.1894). Petitioner argues that it is apparent that the crime with which he is charged is a political offense because there was and is a conflict in Israel that involves violence, and the PLO, to which petitioner allegedly belongs, is a party to that violence.

---

ment's view, when read in context of that opinion and of general principles governing extradition, it suggests quite a different view. At the outset of the opinion, 586 F.Supp. at 868, the court quotes the Supreme Court in *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925), for the proposition that the magistrate is to determine "whether the offense charged is within the treaty," language which tracks that of § 3184 both in form and meaning. Since the *Sabatier* court was not presented with an issue implicating an excep-

tion to the treaty, it is hardly surprising that later in the opinion the court did not specifically refer to broader duties of the magistrate during the extradition hearing. The same appears to be true in *United States v. Clark*, 470 F.Supp. 976 (D.C.Vt.1979), which cites *Sabatier* for the more narrow definition of "its role in this proceeding." *Id.* at 978. The *Sabatier* and *Clark* opinions merely re-state the statutory framework that leaves to the Judiciary the initial determination whether the political offense exception applies.

Petitioner notes that generally the motivation of the individual in committing the alleged crime is not an issue in the extradition proceeding. Lubet & Czaczkes at 203. "[T]he nature of the offense does not depend on the motives of the actor just as [the] nature of the offense may not confer upon the actor certain motives that were not present at the commission of the violation." Bassiouni at 378. However, petitioner maintains "that American courts will seize upon the slightest connection between the crime and political act or objective in order to find a political offense." Cantrell at 795. Thus, petitioner asserts that he cannot be extradited because Israel's allegation of his membership in the PLO is enough to bring his alleged role in the bombing within the scope of the political offense exception. Petitioner's characterization of the American law of extradition is facially plausible. But, like most generalizations about complex legal areas, there is much detail that petitioner's position fails to take into account.

The United States law of extradition has been severely criticized for not having progressed from its origins in nineteenth century British law. *See, e. g.,* Shearer at 181. In particular, it has been asserted that the "narrow interpretation" of the political offense exception which rejects consideration of the motivations behind an alleged crime "may be characterized as both underinclusive and overinclusive, as it tends to exempt from extradition all crimes occurring during a political disturbance, but no offenses which were not contemporaneous with an uprising. . . . [T]he overinclusive aspect of the approach may operate to protect common criminals simply because their crimes occur during times of political disorder." Lubet & Czaczkes at 203, 204. Such a narrow approach "can result in grave abuse" of treaty exceptions for political offenses. Cantrell at 795. While we keep these concerns in mind, we conclude that existing law is sufficiently flexible to avoid such abuses.

The weakness of the approach attributed to American courts is apparent in the case before us. Petitioner consistently has tried to establish that there exists in Israel a state of conflict in the nature of a war, revolution or rebellion. This, he contends, establishes the propriety of using the political offense exception in this case. The magistrate refused to take judicial notice of the existence of a state of political and military conflict between Israel, its neighboring states and national liberation movements in the Middle East. The magistrate did, however, receive evidence on "the nature of the conflict in the Middle East before, during and after the 1948 proclamation of a State of Israel . . . as well as the 1967 occupation by Israel of the West Bank of the country of Jordan. . . ." *In re Abu Eain,* No. 79 M 175 (N.D.Ill. Dec. 18, 1979) (Mem.) at 14. It appears that the magistrate may have assumed that a conflict existed at the time of petitioner's alleged acts since her subsequent discussion on the applicability of the political offense exception went mainly to issues that usually are considered only after a determination of a violent political disturbance has been made.

There remains, however, some question as to whether that finding of a "conflict" is sufficient to establish that there exists in Israel "a violent political disturbance, such as a war, revolution or rebellion." The nature of that conflict is somewhat different than disturbances that have been considered in other cases where resistance to extradition on grounds of a political offense exception has been sustained. Those cases involved on-going, organized battles between contending armies, a situation which, given the dispersed nature of the PLO, may be distinguished. *See, e. g., Ramos v. Diaz,* 179 F.Supp. 459 (S.D.Fla.1959) (members of organized revolutionary army with established chain of command operating within the country); *United States v. Artukovic,* 170 F.Supp. 393 (S.D.Cal.1959) (military government installed by Nazis during World War II; discussed in dictum). Terrorist activity seeks to promote social chaos. Modern international terrorism is a phenomenon apart from the world's experience with more conventional expressions by individuals or groups of their dissatisfaction

with world order. Such terrorism does not conveniently fit the categories of conflict with which the courts and the international community have dealt in the past. An ongoing, defined clash of military forces may be significant because that is one backdrop which may bring into sharp relief an individual act of violence. Once the circumstances move away from that context, the judiciary's task of determining what degree or type of violent disturbance permits a successful invocation of the political offense exception becomes more difficult. It also poses a different question of proof than otherwise may be involved. *See generally* Lubet & Czaczkes at 206, 208–10.

For example, the evidence in this case reveals that the PLO seeks the destruction of the Israeli political structure as an incident of the expulsion of a certain population from the country,[19] and thus directs its destructive efforts at a defined civilian populace. That, it could be argued, may be sufficient to be considered a violent political disturbance. If, however, considering the nature of the crime charged, that were all that was necessary in order to prevent extradition under the political offense exception nothing would prevent an influx of terrorists seeking a safe haven in America. Those terrorists who flee to this country would avoid having to answer to anyone anywhere for their crimes. The law is not so utterly absurd. Terrorists who have committed barbarous acts elsewhere would be able to flee to the United States and live in our neighborhoods and walk our streets forever free from any accountability for their acts. We do not need them in our society. We have enough of our own domestic criminal violence with which to contend without importing and harboring with open arms the worst that other countries

have to export. We recognize the validity and usefulness of the political offense exception, but it should be applied with great care lest our country become a social jungle and an encouragement to terrorists everywhere.

 The magistrate, however, understood that the finding of violent upheaval at the time an allegedly political crime occurred was not the end of the analysis under the political offense exception. She went further and found that petitioner had failed to establish that the bombing was incidental to the PLO's objectives. The magistrate held that simply noting membership in the PLO, but not tying the membership to the specific act alleged was insufficient to satisfy the burden petitioner must shoulder in order to invoke the political offense exception. Absent a direct tie between the PLO and the specific violence alleged, the act involved here, without more, was not the sort which may be reasonably "incidental to" a political disturbance. Because the bombing was not shown to be incidental to the conflict in Israel, the magistrate held that it was therefore not an act covered within the political offense exception. We agree with her conclusion.

 The reason that the bombing was not "incidental to" the conflict does not lie in the motivation for the act, since, for purposes of extradition, motivation is not itself determinative of the political character of any given act. Lubet & Czaczkes at 203 n.102. The definition of "political disturbance," with its focus on organized forms of aggression such as war, rebellion and revolution, is aimed at acts that disrupt the political structure of a State, and not the social structure that established the

---

19. *See* "Covenant Against Israel," adopted by the Palestinian National Council in 1968 and discussed by one of petitioner's witnesses during the hearing before the magistrate. The document asserts that "Palestine" is the rightful homeland solely for "Palestinians." Article 6 of the Covenant then states that "Jews who were living permanently in Palestine until the beginning of the Zionist invasion will be considered Palestinians." A reading of the testi-

mony of that witness, who was produced as petitioner's expert in this area, indicates that the document would mark the "Zionist invasion" as beginning in 1917 or 1922. Jews who arrived in Israel after those years would be unwelcome in the Palestinian state. Because they comprise the bulk of the present-day Israeli Jewish population, they are the targeted group of the "armed struggle" (Covenant, Article 9) that the PLO wages.

government. The exception does not make a random bombing intended to result in the cold-blooded murder of civilians incidental to a purpose of toppling a government, absent a direct link between the perpetrator, a political organization's political goals, and the specific act. Rather, the indiscriminate bombing of a civilian populace is not recognized as a protected political act even when the larger "political" objective of the person who sets off the bomb may be to eliminate the civilian population of a country. Otherwise, isolated acts of social violence undertaken for personal reasons would be protected simply because they occurred during a time of political upheaval, a result we think the political offense exception was not meant to produce.

This policy long has been articulated in extradition cases of this and other nations in the context of terrorist activities, particularly those of anarchists. Although distinguishable in some respects, the case of *In re Meunier* [1894] 2 Q.B. 415, provides the earliest illustration of the principle under British law, from which the American law of extradition developed. France had requested the extradition of Meunier from England where he had traveled after allegedly bombing a cafe and army barracks in the cause of anarchy. In granting France's extradition request, the divisional court on habeas corpus discounted Meunier's claim that his activities aimed at terrorizing an entire population in order to subvert a government through social disorder fell within the political offense exception. The court first noted that the anarchist

movement did not represent a party, in the usual sense of the term, "seeking to impose the Government of their own choice on the other [party]," 2 Q.B. at 419, a prerequisite for invoking the exception. Rather, the aim of the anarchists was to topple the formal political structure by destroying its supporting social fabric.[20] The anarchist's efforts were not directed at the government, but instead were "directed primarily against the separate body of citizens," *id.*, a form of political expression not protected under the political offense exception. As recent commentators have stated, "an offense having its impact upon the citizenry, but not directly upon the government, does not fall within the political offense exception." Lubet & Czaczkes at 202. *See* Costello, *International Terrorism and the Development of the Principle Aut Dedere Aut Judicare*, 10 J.Int'l Law & Econ. 475, 501 (1975) quoting U. N. Secretariat study: "[T]he legitimacy of a cause does not in itself legitimize the use of certain forms of violence especially against the innocent").[21]

Anarchy presents the extreme situation of violent political activity directed at civilians and serves to highlight the considerations appropriate for this country's judiciary in construing the requirements of our extradition laws and treaties. But we emphasize that in this case, even assuming some measure of PLO involvement, we are presented with a situation that solely implicates anarchist-like activity, i. e., the destruction of a political system by undermining the social foundation of the government. The record in this case does not

---

20. We acknowledge that it may not be "textbook" political science and sociology to distinguish between disagreement with a government and with the society that establishes it. Nevertheless, as a practical matter it must be recognized that within every society there will be elements who are dissatisfied with their government. At times this dissatisfaction may be expressed, deliberately or by reason of an uncontrollable flare of temper, in violent acts that have an impact on private social interests. We do not have occasion in this case to consider the boundaries within which the political offense exception operates in these situations. We are concerned here only with a violent act focused at the *social* structure.

21. *Cf.* Note, *Bringing the Terrorist to Justice: A Domestic Law Approach*, 11 Cornell Int'l L.J. 71, 82 (1978), discussing the Swiss concepts of "predominance" and "proportionality": "The criminal action must be 'immediately connected with its political object,' and the damage caused must not be out of proportion to the desired result." The parties did not argue the direct application of these concepts to American extradition law. While proportionality and predominance may be unarticulated concepts in the existing Anglo-American framework of extradition, we leave consideration of that question for another time.

indicate that petitioner's alleged acts were anarchist-inspired. Yet the bombing, standing detached as it is from any substantial tie to political activity (and even if tied, as petitioner insists, to certain aspects of the PLO's strategy to achieve its goals), is so closely analogous to anarchist doctrine considered in cases like *In re Meunier*, as to be almost indistinguishable.

We have found no American cases that detract in any way from the applicability of the *Meunier* theory to the case before us. The case that comes closest to challenging *Meunier*'s applicability is dictum contained in *United States v. Artukovic*, 170 F.Supp. 383 (S.D.Cal.1959), one of the most roundly criticized cases in the history of American extradition jurisprudence. *See, e. g.*, Lubet & Czaczkes at 206–07; Garcia-Mora at 1246–47; Cantrell at 795–96. In *Artukovic*, the magistrate commented in dictum that he believed murders of civilians were political offenses when carried out pursuant to the orders of a Croatian government official who was serving at the time with the blessing of the Axis powers in World War II. Against the backdrop of confused and rapid shifts of wartime government, the magistrate felt, killings accomplished by various militia protecting each successive government constituted political acts. 170 F.Supp. at 392–93. The magistrate noted that orders for the killings were aimed at specific racial groups denominated "enemies" of the Croatian government, not at the general population. *Id.* at 390.

The reasoning in the *Artukovic* case (which of course is not binding precedent for this court) can be distinguished from the facts before us, since the acts constituting Artukovic's alleged offenses were carried out by a government in power, which was at least nominally seeking to eliminate its political "enemies." In the present case, the bombers could not discriminate between their victims. We note that the *Artukovic* court's dictum could not be challenged by the United States government on appeal, since the initial decision in extradition cases effectively terminates proceedings upon a finding that a person is not extraditable. And the actual holding in the case was that Artukovic could not be extradited since the government failed to show probable cause that he committed the crimes. We also note that the country which sought Artukovic's extradition had obtained a United States Supreme Court order vacating earlier judgments that found the political offense exception applicable to the case. *Karadzole v. Artukovic*, 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356 (1958).[22]

Other cases more sharply demonstrate the difference between the usual application of the political offense exception and the situation before us here. For example, the more usual situation occurred in *Ramos v. Diaz*, 179 F.Supp. 459 (S.D.Fla.1959). The district judge conducting the initial extradition hearing pursuant to 18 U.S.C. § 3184 found that the killing of a political prisoner by two members of Castro's revolutionary army in Cuba (who had left that country after the revolution) was a political offense preventing extradition of the alleged killers upon request from Communist Cuba. The district judge noted that the victim was "one of many political prisoners captured in furtherance of the political uprising. The Defendants were under the command of the revolutionary forces engaged in mopping up operations as part of the revolution." 179 F.Supp. at 459. The situation thus was unlike petitioner's alleged actions in the present case, where the killings were done, so far as we can tell from the present record, without regard for political affiliation or governmental or military status of the victims.[23]

**22.** *See* 170 F.Supp. at 383–86 for a full account of the *Artukovic* case's convoluted progress through the judicial system.

**23.** As a collateral matter, petitioner claims there is no evidence that those who were killed and injured in the Tiberias bombing were civil-

ians, and thus argues that discussion of their civilian status is inappropriate at all levels of this case. It should be pointed out that our discussion revolves around the population to which the violent act was directed. The fact that the explosive was placed on a busy public street during a public holiday in a resort city

We note that even in the nineteenth century the United States Supreme Court indicated that the civilian status of victims is of significance when courts consider the political offense exception. In *Ornelas v. Ruiz,* 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896), the Court upheld a magistrate's determination that a raid on a Mexican village and its military garrison by more than a hundred men was not incidental to violent political disturbances that were occurring in Mexico at the time, as the raiders had claimed. The Court felt that the magistrate was justified in refusing to apply the political offense exception, "in view of the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed." 161 U.S. at 511, 16 S.Ct. at 693. The applicability of *Ruiz* to the present case is even more compelling when one notes that the raiders were later tried in Mexico for their participation in the revolution they claimed the raid had furthered. 4 G. Hackworth, Digest of International Law, § 316, pp. 50–51 (1942). It is apparent that the Supreme Court viewed the raid as the sort of political activity that is not encompassed within the political offense exception, especially when

the tie to a larger political cause was ambiguous in that specific instance.[24]

We likewise conclude that the magistrate in this case was correct in holding that the alleged bombing directed at a civilian population was not incidental to political upheaval, however characterized, which was occurring at the time in Israel. Petitioner may not claim the benefit of the political offense exception clause contained in Article VI of the United States extradition Treaty with Israel.

## CONCLUSION

We affirm the district court's conclusion that the magistrate was correct under the established law of this country in finding probable cause to believe petitioner guilty of the crime charged for which he could be extradited to Israel. However, the determination of whether the petitioner is actually guilty or not requires consideration of all the evidence at a trial within the jurisdiction where the act is alleged to have been committed. That is not for our courts to determine within the limitations of a probable cause hearing. We therefore uphold the magistrate's certification to the Secretary of State and the commitment of

and that it is alleged petitioner said he would avoid all contact with the Israeli military makes it clear that the explosion was meant to snare civilian victims. In any event those killed were children. There is nothing in the record to suggest the possibility of any Israeli military involvement in any way.

24. The extradition treaty involved in *Ornelas v. Ruiz* apparently excepted crimes of a "purely political" character from its scope. It might be argued that the Supreme Court simply was distinguishing "pure" political offenses (treason, sedition and espionage), which never are extraditable, *see* Lubet & Czaczkes at 200, from situations where a petitioner claims he is accused of committing "relative" political crimes (common crimes with political overtones), which may not be extraditable, but which pose more difficult problems of proof. However, American courts "read the political offense exception broadly enough to bring in relative offenses," Note, *Bringing the Terrorist to Justice: A Domestic Law Approach*, 11 Cornell Int'l L.J. 71, 82 (1978), and the Supreme Court's discussion in *Ruiz* of the acts constitut-

ing the alleged crimes leaves no doubt that the specific treaty language made no difference to the political offense analysis: relative political crimes fell within the exception for "purely political" crimes. Otherwise, the Court need not have reviewed at length the specific acts alleged. A "pure" political offense exception clause, had it made any difference to the analysis, would have been determinative without further discussion.

At any rate, the only support we have found for a substantive distinction in American law between "pure" and "relative" political offenses under specific treaty language is contained in Garcia-Mora, 48 Virginia L.Rev. at 1232. However, Garcia-Mora goes on to cite an American treaty with language identical to that involved in this case, and says the language applies to except from extradition only pure political crimes. If Garcia-Mora is correct, then petitioner automatically is extraditable, since no one argues here that the acts of which he is accused constitute pure political offenses. The point was not argued in this case.

petitioner to jail [25] until he may be surrendered to Israel upon a warrant issuing from the proper authorities of that country's government.[26,27]

Affirmed.

25. On January 19, 1981, petitioner filed in this court a motion entitled "Emergency Petition to Rule on Appellate Motion to Reconsider Bail." Petitioner has made previous applications for bail. The present motion, which reveals no emergency, but alleges substantial security for bail and reargues the merits of the case, is now moot.

26. The Secretary of State has two months from the date of commitment following final judicial action in this case to surrender petitioner to the proper Israeli authorities if the Secretary in his discretion determines that surrender is appropriate. 18 U.S.C. § 3188; *Jimenez v. U. S. Dist. Court for Southern Dist. of Florida*, 84 S.Ct. 14, 11 L.Ed.2d 30 (1963) (Goldberg, J., in chambers). The final decision of whether petitioner is ultimately to be surrendered or not lies with the Secretary and not with this court.

27. Our holding in this case is not intended in any way to reflect a view one way or the other as to the merits or equities of any social or political problems existing between Israel and other parties. Those judgments are clearly far outside judicial bounds.