Jose F. RAMOS, Vice Consul in behalf of
the Republic of Cuba, Plaintiff,

v.

Humberto Rodrianez DIAZ, Defendant.

Jose F. RAMOS, Vice Consul in behalf of
the Republic of Cuba, Plaintiff,

v.

Roberto Perez CRUZATA, Defendant.

Civ. Nos. 9413–M, 9414–M.

United States District Court
S. D. Florida,
Miami Division.

Dec. 18, 1959.

**460**

Worton & Cline, Miami, Fla., for plaintiff.

Richard H. Hunt, Miami, Fla., for defendant Humberto Rodrianez Diaz.

Hugh M. Tartaglia, Miami, Fla., for defendant Roberto Perez Cruzata.

LIEB, District Judge.

The above entitled causes, consolidated for the purpose of these proceedings, came on to be heard upon the Complaints for extradition heretofore filed by the Plaintiff, Jose F. Ramos, Vice Consul in behalf of the Republic of Cuba, seeking the surrender and extradition of the Defendants, Humberto Rodrianez Diaz and Roberto Perez Cruzata.

The Complaints allege that the Defendants are fugitives from justice within the provisions of the Treaty of Extradition between the United States and Cuba, that they have been duly tried, convicted, and sentenced for the crime of murder in Cuba and have escaped from prison in that country, and that they are now within the territorial jurisdiction of this Court.

This Court, after examining the Complaints, issued warrants upon which the Defendants were apprehended and they are presently held in custody thereunder, in default of bond.

In accordance with the provisions of § 3184 Title 18 U.S.C.A., a hearing was held by the Court on said Complaints at which time the demanding government filed in evidence, under the certificate of the United States Chargé d'affaires at Havana, Cuba, in compliance with § 3190 of Title 18 U.S.C.A., a transcript of the proceedings of the Purging and Investigation Commission of the Military Department of La Cabana, Havana, sitting as an Ordinary Court Martial. This record showed that after trial before it, the said Court found the Defendants guilty of the murder of one Rafael Escalona Almedia at Havana on January 10, 1959. It further showed that the said Court sentenced the Defendant Diaz to twenty years imprisonment and the Defendant Cruzata to fifteen years imprisonment for the said offense and that after commencement of service of the said sentences, both Defendants escaped from prison on July 1, 1959, and took refuge in the United States at Miami, Florida.

The said transcript was the only evidence offered by the Cuban government in support of its demand. The only evidence offered on behalf of the Defendants was the oral testimony of the Defendant Diaz, which evidence was offered also on behalf of the Defendant Cruzata, who did not testify.

The right of a foreign power to demand the extradition of one accused of crime and the correlative duty to surrender him exists only when created

by treaty; and in the United States, in the absence of statutory or treaty provision therefor, no authority exists in any branch of the government to surrender a fugitive criminal to a foreign government.[1]

Jurisdiction in extradition cases is vested in Federal District Courts [Title 18 U.S.C.A. § 3184]. There is a valid existing treaty between the government of the United States and the government of the demanding nation, the Republic of Cuba, providing for extradition, which was entered into by both nations on April 6, 1904 [33 Stat. 2265]. This treaty was later amended [33 Stat. 2273] and an additional treaty was entered into by the high contracting parties in 1926 [44 Stat. 2392] adding certain offenses to those already listed in the prior treaties. Although Article II, Paragraph 1, of the treaty of April 6, 1904, as amended, which is still in force and effect, makes murder an extraditable crime, together with other crimes not pertinent to these cases, Article VI of the same treaty specifically exempts therefrom all offenses of a political character, in the following language:

"A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if it is proved that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character."

\* \* \* \* \* \*

"If any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government on which the demand for surrender is made, or which may have granted the extradition shall be final."

The Court finds from the evidence that the Defendants are the persons charged in the Complaints; that they are charged with the commission of an extraditable offense [i. e. murder] under the provisions of a valid and subsisting treaty; and that they are subject to extradition unless the offense charged is of a political character, for under the provisions of Article VI of the treaty political offenses are exempt from extradition.

The demanding government contends that since the Defendants have been convicted and sentenced and are not merely under charges for the crime of murder, it is sufficient to obtain an order of extradition if there is produced a duly authenticated copy of the sentences of the Court and the identity of the Defendants and their status as fugitives is proven; and that, under such circumstances, the Defendants are prevented from raising the question that the crime of which they have been convicted was a political offense.

This contention is without merit. The provision of the treaty exempting therefrom political offenses is not limited in its terms, but applies to all such offenses whether or not the person sought to be extradited was convicted or is merely charged with the commission of the offense. This is the established rule in this country for the enforcement of such treaty provisions.[2]

The most authoritative American Court decision on the specific problem is the comparatively recent case of Karadzole v. Artukovic, decided by the Court of Appeals of the Ninth Circuit in 1954.[3] The case involved the demand by the Government of Yugo-Slavia to extradite the defendant who was charged with the crime of murder in that country and who had taken refuge in the United States. The evidence showed that the alleged murders took place during the course of a struggle for power by various factions in that country and were attributed to the defendant because he as a government official had issued certain

---

1. 35 C.J.S. Extradition § 24, p. 351.

2. Hackworth, Digest of International Law IV, Pages 50, 51, 52.

3. 247 F.2d 198, 202.

orders which had resulted in the deaths of the persons claimed to be the murder victims.

Judge Stephens speaking for the Court in holding that the offenses were political crimes and the defendant not subject to extradition under the provisions of the treaty then existing between the United States and Yugo-Slavia, which provisions were identical in language to those involved in the treaty involved in this case, reviewed the leading English and American cases on the subject and said:

" *   *   * Perhaps the leading case on the subject is In re Castioni, (1891) 1 Q.B. 149. In that case, the following pertinent comments are made:

"Denman, J. (page 156).

" 'I think that in order to bring the case within the words of the Act and to exclude extradition for such an act as murder, which is one of the extradition offences, it must be shewn that the act is done in furtherance of, done with the intention of assistance, as a sort of overt act in the course of acting in a political matter, a political rising, or a dispute between two parties in the State as to which is to have the government in its hands, before it can be brought within the meaning of the words used in the Act.'

"Hawkins, J. (page 165).

" ' *   *   * I think, therefore that the expression in the Extradition Act ought (unless some better interpretation of it can be suggested) to be interpreted to mean that fugitive criminals are not to be surrendered for extradition crimes, if those crimes were incidental to and formed a part of political disturbances. *   *   *' "

In holding that Artukovic was charged with a political offense and was not extraditable, Judge Stephens cited and followed the earlier American case of In re Ezeta which was decided in 1894[4]

and established the definition of a political offense which has been consistently adopted in our Courts:

"Any offense committed in the course of or furthering of civil war, insurrection, or political commotion."

In the Ezeta case the Court also quoted extensively, with approval, from the English case of In re Castioni, supra, and made the interesting observation that in that case it was admitted that the killing charged to Castioni was a misfortune and was not necessary to the uprising in which Castioni was then engaged, and that despite this fact Justice Denman held it was nevertheless a political offense in the following passage from his opinion:

"The question really is whether, upon the facts, it is clear that the man was acting as one of a number of persons engaged in acts of violence of a political character with a political object, and as part of the political movement and rising in which he was taking part."

■ The evidence presented in the instant case, as well as the recent events and occurrences in Cuba, of which this Court takes judicial notice, reveals that the Defendants Diaz and Cruzata were active participants in the revolutionary movement headed by Fidel Castro from its inception, Diaz being a captain and Cruzata being a corporal in the revolutionary army. On January 7, 1959, immediately after the fall of the Batista government, Diaz was in command of an army unit in charge of rounding up alleged enemies of the revolutionary movement and soldiers and sympathizers of the government of the deposed President Batista. This operation soon reached the proportion of a mass round-up and, because of lack of proper prison facilities in Havana, the prisoners were kept at a garage under Diaz's command. During the night of the 10th of January one of the prisoners, Rafael Escalona Almeida,

was shot and killed by the Defendant Cruzata, who was a guard at the garage.

The Cuban government records filed in evidence recited that Defendant Diaz rushed to the scene of the shooting and fired a final pistol shot into the dying prisoner. Diaz denied shooting the prisoner, but testified that the prisoner was shot by Cruzata while the prisoner was attempting to escape and was assaulting the guard. At the time of the shooting neither Cruzata nor Diaz knew the prisoner who was shot. It was a standing order of the Castro army that anyone guarding a prisoner who permitted him to escape was himself subject to summary execution. At the time of the shooting there existed much turmoil and excitement with remnants of the Batista regime fighting with the victorious Castro troops and arrests and executions were commonplace.

The Defendant Diaz further contended in his testimony that the prisoner who was shot was subsequently identified as a prominent member of the Cuban Communist Party who had been arrested as a supporter of Batista. Much testimony was offered by this defendant to show that the subsequent trial and conviction of him and Cruzata for the killing was inspired and promoted by the Communist organization in Cuba, having great influence with the Castro government.

■ The motive of the Cuban government in demanding the extradition of the Defendants is not controlling. The status of the offense committed, whether it is a political crime or not is to be determined by the circumstances attending the crime at the time of its commission and not by the motives of those who subsequently handle the prosecution.

■ Likewise, the Cuban government's contention that there could be no political crime where the demanding government is of the same political side that the Defendants were on at the time of the shooting, is not decisive, for again, if the evidence concerning the shooting incident disclosed that the crime was incident to and was committed as a part of a political disturbance or conflict between the Batista group and the Castro group then contesting for political power in Cuba, it was a political crime and as such not subject to extradition under the treaty.

■ American authority indicates clearly that when evidence offered before the Court tends to show that the offenses charged against the accused are of a political character, the burden rests upon the demanding government to prove to the contrary.[5]

■ It is an essential part of the case for the demanding government that it be established not only that the crime charged is one of those enumerated in the treaty but also that it is an extraditable one.

The Defendants offered testimony, which is unrebutted, that the Defendants were members of a revolutionary movement, that the crime allegedly committed by them took place in the early days of the victory of the revolutionary forces, and as a part of a political uprising and disturbance. The Defendants bore no ill will or malice toward their victim, who was just one of the many political prisoners captured in furtherance of the political rising. The Defendants were under the command of the revolutionary forces engaged in mopping up operations as a part of the revolution.

These established facts placed the burden on the demanding government to prove that the crime charged in the Complaints was not of a political character. The demanding government failed to sustain this burden.

The crime charged is one of a political character for which extradition can not be had under the provisions of the Extradition Treaty between the United States and Cuba. The relief sought by

5. Hyde's International Law Chiefly as Interpreted and Applied by the United States, Second Revision, Vol. II, page 1025.

each of the Complaints must be denied and the Complaints dismissed.

An appropriate order will be entered in conformity with this Memorandum Opinion in each of these cases dismissing the Complaints and discharging each of the Defendants from custody of the Marshal.