MATTER OF MALDONADO-CRUZ

In Deportation Proceedings

A-27549626

Decided by Board January 21, 1988

(1) A threat to harm or kill a deserter from a guerrilla organization operating in a country does not constitute persecution under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

(2) In analyzing a claim of persecution made in the context of a civil war, it is necessary to examine the motivation of the group threatening harm.

(3) The threat to harm a deserter from the guerrilla organization is part of a military policy of that group, inherent in the nature of the organization, and a tool of discipline; thus, the threat is neither an act of persecution nor evidence of persecution by the guerrilla organization on account of political opinion, or any other ground set forth in the Refugee Act of 1980.

(4) The holding of *Bolanos-Hernandez v. INS*, 767 F.2d 1277 (9th Cir. 1984), is not applied outside of the Ninth Circuit.

(5) It is not persecution for the government of a country to investigate and detain individuals suspected of aiding or being a member of a guerrilla organization.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspection

ON BEHALF OF RESPONDENT:
Steven M. Rosenthal, Esquire
Wilmer, Cutler and Pickering
2445 M Street, N.W.
Washington, D.C. 20037-1420

ON BEHALF OF SERVICE:
James Ray Blinn, Jr.
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members. Concurring Opinion: Heilman, Board Member.

On January 14, 1987, the immigration judge found the respondent deportable as charged, denied his applications for asylum and for withholding of deportation under sections 208 and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158 and 1253(h) (1982), and denied him the privilege of voluntary departure in lieu

of deportation. The respondent has appealed from that decision. The appeal will be dismissed.

The respondent is a native and citizen of El Salvador who conceded that he entered the United States without inspection on October 21, 1986. Accordingly, his deportability is established by clear, unequivocal, and convincing evidence. *Woodby v. INS*, 385 U.S. 276 (1966). The respondent agrees that the issues presented on appeal are his eligibility for asylum and withholding of deportation.

## THE PROCEDURAL CONTENTIONS

We first address the respondent's procedural arguments raised on appeal. The respondent claims that, due to the conditions of detention and the lack of "consistent Spanish speaking counsel and translators," he was unable to communicate "significant facts" concerning his asylum application. We find no evidence in the record to support the respondent's contention. The respondent was represented by counsel prior to, during, and subsequent to his deportation hearing. Moreover, on appeal, the respondent's case was fully briefed and argued by his counsel before the Board. During the deportation hearing a Spanish-language translator was utilized. We have considered the affidavits of the respondent and his counsel and we are convinced that he was given a full and fair opportunity to present his asylum claim. We find no prejudice to the respondent. *Matter of Santos*, 19 I&N Dec. 105 (BIA 1984); *see also Patel* v. *INS*, 803 F.2d 804 (5th Cir. 1986).

## THE RESPONDENT'S PERSECUTION CLAIM

We also find that the immigration judge properly denied the respondent's applications for asylum and withholding of deportation. The respondent bears the evidentiary burdens of proof and persuasion in any application for withholding of deportation under section 243(h) or asylum under section 208 of the Act. *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); 8 C.F.R. §§ 208.5, 242.17(c) (1988). The respondent must establish the facts underlying his claims for such relief by a preponderance of credible, probative evidence. He must also establish that the facts proven satisfy the statutory standards of eligibility for these forms of relief. *Matter of Acosta, supra.*

To be eligible for withholding of deportation pursuant to section 243(h) of the Act, an alien's facts must show a clear probability of

persecution in the country designated for deportation on account of race, religion, nationality, membership in a particular social group, or political opinion. Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982); section 208 of the Act. The United States Supreme Court has determined that the "well-founded fear" standard imposed on asylum applicants differs from the "clear probability" standard imposed on aliens who seek withholding of deportation and that the evidentiary burden for establishing entitlement to withholding of deportation is greater than that imposed on aliens who seek asylum. *INS* v. *Cardoza-Fonseca*, 480 U.S. 421 (1987).

An applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution. *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).[1]

The respondent's persecution claim consists of the following facts. The record indicates that the respondent entered the United States on three separate occasions, the last time being in 1985. He claims that, sometime in 1983, he and a friend were kidnapped by guerrillas in El Salvador. The respondent claims that, after several days of training, he was forced to participate in a guerrilla operation against his village. During the operation, the respondent's friend was killed by the guerrillas when he tried to escape. The respondent claims to have heard of his friend's death through conversations with other guerrillas. A few days later, the respondent managed to escape from the guerrillas and went to his parents' home, and, after spending a few hours there, he left for San Salvador. The respondent claims that, while waiting for a bus in San Salvador, he met some neighbors from his village who told him the guerrillas had been looking for him. A short time later, the respondent left San Salvador and went to Guatemala and eventually made his way to the United States. The respondent believes that the guerrillas will kill him for having deserted them.

The respondent further states that the military forces of El Salvador will persecute him because of their "perceived political opinion" that he is a member of the guerrillas.

## THE CLAIM OF PERSECUTION BY THE GUERRILLAS

The first issue in the respondent's asylum claim is whether his fear that he will be harmed or even killed by the guerrilla organi-

---

[1] In his decision, the immigration judge found certain parts of the respondent's testimony incredible. However, he ultimately based his decision on the respondent's failure to establish a valid persecution claim. Accordingly, we address this issue on appeal.

zation he was forced to join constitutes a threat of persecution, or a threat of some other nature not encompassed by the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102. In other words, the issue does not involve questions of proof, but whether the harm the respondent fears is on account of "political opinion" as this term is used under section 101(a)(42)(A) of the Act. *See Campos-Guardado v. INS,* 809 F.2d 285, 291 (5th Cir. 1987).

An alien who succeeds in establishing a well-founded fear of being harmed will not necessarily be granted asylum. Thus, for example, aliens fearing retribution over purely personal matters or those fleeing general conditions of violence and upheaval in their native countries would not qualify for asylum. Such persons may have well-founded fears of harm but such harm would not be on account of their race, religion, nationality, membership in a particular social group, or political opinion. *See, e.g., Sanchez-Trujillo v. INS,* 801 F.2d 1571 (9th Cir. 1986); *Contreras-Aragon v. INS,* 789 F.2d 777 (9th Cir. 1986); *Diaz-Escobar v. INS,* 782 F.2d 1488 (9th Cir. 1986); *Daily v. INS,* 744 F.2d 1191 (6th Cir. 1984); *Carvajal-Munoz v. INS,* 743 F.2d 562 (7th Cir. 1984); *Martinez-Romero v. INS,* 692 F.2d 595 (9th Cir. 1982); *Matter of Pierre,* 15 I&N Dec. 461 (BIA 1975).

In *Campos-Guardado v. INS, supra,* the United States Court of Appeals for the Fifth Circuit observed: "The issue reduces to whether the political implications underlying an alien's fear of harm rise to the level of 'political opinion' within the meaning of the statute or whether those conditions constitute the type of civil strife outside the intended reach of the statute." *Id.* at 290. In *Matter of Acosta, supra,* we observed:

> [T]he respondent did not demonstrate that the persecution he fears is "on account of political opinion." The fact that the respondent was threatened by the guerrillas as part of a campaign to destabilize the government demonstrates that the guerrillas' actions were undertaken to further their political goals in the civil controversy in El Salvador. However, conduct undertaken to further the goals of one faction in a political controversy does not necessarily constitute persecution "on account of" political opinion so as to qualify an alien as a "refugee" within the meaning of the Act.

*Id.* at 234.

The Ninth Circuit stated the following in *Hernandez-Ortiz v. INS,* 777 F.2d 509 (9th Cir. 1985):

> A clear probability that an alien's life or freedom is threatened, without any indication of the basis for the threat, is generally insufficient to constitute "persecution". . . . There must also be some evidence that the threat is related to one of the factors enumerated in section 243(h).

*Id.* at 516. The court further stated:

[I]n determining whether threats or violence constitute political persecution, it is permissible to examine the motivation of the persecutor; we may look to the political views and actions of the entity or individual responsible for the threats or violence, as well as to the victim's, and we may examine the relationship between the two.

*Id.* Persecution will occur "only when there is a difference between the persecutor's views or status and that of the victim; it is oppression which is inflicted on groups or individuals because of a difference that the persecutor will not tolerate." *Id.*

We believe that this formulation offers a practical approach to analyzing claims of persecution. We are unaware of any express discussion of this issue in the Fifth Circuit where this case arises. We believe, however, that Fifth Circuit cases do not conflict with the formulation in *Hernandez-Ortiz* v. *INS, supra. Cf. Campos-Guardado* v. *INS, supra.*

In analyzing a claim of persecution made in the context of a civil war, it is necessary to look to the motivation of the group threatening harm. Even though guerrillas may have the political strategy of overthrowing the government by military means, this does not mean that they cannot have objectives within that political strategy which are attained by acts of violence, but whose motivation is not related to any desire to persecute.

Historically, civil wars or revolutions have always contained strong currents of violence, threats, destruction, intimidation, and indeed ruthlessness. Individuals harmed by such violence or threats of harm in a civil war situation are not necessarily persecuted "on account of" the five categories enumerated in section 101(a)(42)(A) of the Act. *See Campos-Guardado* v. *INS, supra.*

We now turn to the facts of the respondent's case in order to determine whether he has established a well-founded fear of persecution on account of political opinion. The first encounter that the respondent had with the guerrillas was their forced recruitment of him. The respondent was kidnapped by the guerrillas. It does not appear that there were any elements of persecution in this encounter. The guerrillas did not approach him to harm him because they considered him to have characteristics the guerrillas found offensive or which they wished to overcome. The guerrillas wanted him to be a member of their group, even if his help was not provided willingly, or at least not volunteered.

The nature of the respondent's initial encounter with the guerrillas is important because it reveals that he was not seen as an object of hatred. There was nothing about him which the guerrillas considered offensive, or for which they wished to punish him. From this we may fairly conclude that the guerrillas did not view the respondent as an object of racial, religious, or political hatred;

513

indeed, they took him into their band because he was of use to them.

The first encounter he had with the guerrillas does not provide any evidence of persecution. It is, however, directly relevant to the second crucial determination, which is whether the nature of his relationship to the guerrillas, or their perception of the respondent, later changed in such a way as to transform him into an object of persecution. The salient facts in this second examination are the fact of his desertion, and the guerrillas' reaction to that act by the respondent.

There is no evidence in the record that the guerrillas attribute any political opinion to the respondent that they find offensive. There is also no evidence that the guerrillas have the slightest interest in the reason or reasons the respondent deserted, whether it was dislike for the guerrillas' political platform, dislike for life on the run, or fear of the government. The fact of the matter is that, as far as they know, he might sympathize with the guerrillas but have strong reasons for not wanting to be with them.

The analysis one engages in at this point hinges to a certain extent on assumptions one may have concerning the nature of the guerrillas' struggle occurring in El Salvador and on the nature of guerrilla struggles in general. These assumptions, or presumptions, are completely legitimate bases for coming to grips with the questions presented. For example, in *Hernandez-Ortiz v. INS, supra,* the court based its decision in great part on a presumption that a government acts militarily in a particular manner:

> When a government exerts its military strength against an individual or a group within its population and there is no reason to believe that the individual or group has engaged in any criminal activity or other conduct that would provide a legitimate basis for governmental action, the most reasonable presumption is that the government's actions are politically motivated.

*Id.* at 516.

It is entirely proper to apply a presumption in this case that a guerrilla organization, as a military or a para-military organization, has the need to control its members, to exercise discipline. This is a presumption that is based on the nature of the guerrilla organization. It is understood in El Salvador that guerrilla groups do not rely entirely on volunteers to man their military units.[2]

---

[2] See the 1986 Country Reports on Human Rights Practices, Joint Committee of the Senate and House of Representatives, 100th Congress, 1st Session (1987) ("Country Reports"), which states:

> The FMLN engages in kidnaping for a variety of motives: for ransom; as a form of recruitment of new combatants, including children as young as 10 years of
> *Continued*

Guerrillas depend for food and other essentials on a population which may not be inclined to actively assist them, or which may not have the means to do so.

The guerrillas need military units to operate against the government. To keep them as cohesive fighting units they must impose discipline; and an important form of discipline, common to military or para-military organizations alike, is the punishment of deserters. This is an essential element of control in a situation which is at best difficult, and which may unravel if persons may simply decide to leave when they choose. If, for instance, the guerrilla group came under persistent attack, with substantial casualties, individuals might easily be tempted to desert. If sufficient numbers did this, then the guerrilla group would cease to exist. One way to prevent this is the threat of retaliation against anyone who deserts, and anyone who aids the deserter. *See, e.g.,* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees,* 39–42 (Geneva, 1979) ("Handbook").

The present relationship of the respondent to the guerrillas, and their motivation to harm him, lack any indication of persecution.

The respondent's own version of why the guerrillas were looking for him supports our analysis. The guerrillas were looking for him because they were concerned that he had informed on them to the Salvadoran military. The respondent's lengthy statement attached to his asylum application clearly indicates this reason. According to the respondent, "When I was with [the guerrillas], I had heard them discuss attacks that they made and planned to make on several towns in the area, and I also thought they would fear that I

---

age; to obtain workers to grow and cook food, obtain supplies, transport smuggled material, and perform other tasks.

. . . .

The Government prohibits forced labor. The guerrillas, however, have kidnaped peasants and forced them to cook, do laundry, and perform other tasks, as well as to become combatants.

Clear evidence emerged in 1986 of use by the FMLN of children under the age of 15 in combat. Following one military operation, the Government rescued children, one of whom was 14 years old and had been fighting with the FMLN for 4 years. Other information emerged about the existence of units composed of children receiving military training for integration into combat units. Still other credible reports were received of children being kidnaped for forced recruitment into the FMLN and of their use of couriers and spotters, practices contrary to Geneva Convention prohibitions against the recruiting of children into armed groups or their participation in hostilities.

*Id.* at 492, 495.

would inform the military of this and the location of their camp." When the respondent escaped from the guerrillas and travelled to San Salvador, he met a couple from his hometown. They told the respondent that the guerrillas had come to his hometown to look for him: "The guerrillas wanted to know whether I had gone to the military post."

During the deportation proceedings the respondent testified that he was afraid of the guerrillas because he deserted them. During oral argument and in a subsequent brief, the respondent now argues that he would be persecuted if he returned to El Salvador due to his "political opinion of neutrality." The respondent relies upon *Bolanos-Hernandez* v. *INS*, 767 F.2d 1277 (9th Cir. 1984). We do not find it appropriate to apply the Ninth Circuit's decision in that case in the Fifth Circuit, the circuit where this case arises. We know of no Fifth Circuit case which agrees with the rationale of *Bolanos-Hernandez*. Moreover, the facts of the instant case are inapposite to the holding of *Bolanos-Hernandez*. The respondent did not establish a principled position of neutrality such as can be found in *Bolanos-Hernandez* and its progeny. *See, e.g., Lopez* v. *INS*, 775 F.2d 1015, 1016-17 (9th Cir. 1985). Rather, as we have observed, the evidence is at variance with this contention. The respondent's testimony and his statement attached to his Form I-589 (Request for Asylum in the United States) all show a fear based on his desertion, not "neutrality."

The record is devoid of any evidence that the guerrillas, who initially recruited the respondent to their cause, have any motivation to harm him because he holds views contrary to their political objectives. The threat against the respondent is consequently part of a military policy of the guerrilla organization, inherent in the nature of the organization, and a tool of discipline necessary to the continued functioning of the organization. The threat is therefore neither an act of persecution nor evidence of persecution by the guerrilla organization against the respondent on account of political opinion, or on any other ground set forth in the Refugee Act of 1980. *See Matter of Acosta, supra*, at 211.

This Board has previously dealt with the question of retaliation by a political organization against an individual who had "resigned" from the organization and who later refused to carry out a mission. *Matter of McMullen*, 19 I&N Dec. 90 (BIA 1984), *aff'd, McMullen* v. *INS*, 788 F.2d 591 (9th Cir. 1986). The Board stated:

The record clearly shows that the PIRA uses violence and threats of violence internally to maintain discipline and order within the rank and file of its membership. As such, the PIRA's use of violence against its members is essentially apolitical, representing an indifference to the personal views and opinions of those

members who are subject to sanctions. We conclude that this internal use of violence by the PIRA does not constitute persecution within the meaning of the Act.

*Id.* at 7.

This characterization of the PIRA's internal operation is significant because it was based on an extensive analysis of the voluminous evidence presented at McMullen's asylum hearing. To the extent that one can assume basic similarities between the PIRA and the Salvadoran guerrilla organization to which the respondent belonged, *McMullen* does provide a strong basis for rejecting the view that the respondent's desertion and the guerrillas' threat constitute, on the one hand, a "characteristic" of the respondent coming within the refugee definition and, on the other hand, a reaction to that characteristic by the guerrillas so that the threat against him becomes an act of, or evidence of, persecution.

The respondent's problem is not that the guerrillas are motivated to hate him because of political views they "impute" to him, but rather is that he has breached their discipline in a way that cannot remain unpunished. They might deal with an informer or a rapist in the same manner, if it suited their military or political needs. A guerrilla organization may therefore have a rational basis to punish deserters, devoid of any intent to inflict harm on account of political opinion. There is no reason in logic or fact to find otherwise.

The analysis applied here is, in addition, virtually identical to that applied in the case of a deserter from a conventional military force, for example, a deserter from the Salvadoran Army.

A country has the right to establish rules of military conduct and to punish those who violate them. In assessing whether the punishment meted out to an individual constitutes persecution or prosecution, it has been consistently held that there must be proof that the punishment is heightened by the fact the individual is of a race, religion, or political opinion that is considered offensive by the government. There has never been a presumption that the punishment is per se proof of the government's perception that the individual is opposed to the government, and that the government is motivated to punish the individual on that basis. There is an implicit presumption of a legitimate basis for punishment. *Chao-Ling Wang v. Pilliod*, 285 F.2d 517 (7th Cir. 1960); *Matter of Liao*, 11 I&N Dec. 113 (BIA 1965).

## THE CLAIM OF PERSECUTION BY THE GOVERNMENT

The respondent also contends that he will be persecuted by the military forces of the Government of El Salvador if he is forced to

return there, because they will "assume" that he is affiliated with the guerrilla group he was forced to join. We find this contention to be without merit.

We have already observed that an armed rebellion or civil war exists in El Salvador. *See* Country Reports, *supra*. There are operating in that country armed guerrilla organizations whose avowed purpose is the overthrow of the Government of El Salvador, a government recognized by the Government of the United States. As this is so, and there is no evidence in the record or elsewhere to establish that the Government of El Salvador is anything other than a duly constituted and functioning government of that country, it has the internationally-recognized right to protect itself against the guerrillas who seek to overthrow it. The Government of El Salvador, therefore, has a legitimate right to investigate and detain individuals suspected of aiding or being a member of such an organization. *See generally Handbook, supra*, para. 175, at 41.

If the Government of El Salvador has received information implicating the respondent as a guerrilla, then it has the legitimate right to seek him out and determine whether he is indeed involved with such an organization. *See Hernandez-Ortiz* v. *INS, supra*, at 516. If a citizen of the United States is alleged to belong to a clandestine organization which is operating in the United States and is engaged in violent activity to further its political goal, federal authorities would properly seek him out. The Government of El Salvador, too, has a legitimate right to take similar action. The respondent, therefore, is not at risk of persecution for a characteristic enumerated in section 101(a)(42)(A) of the Act. *See Campos-Guardado* v. *INS, supra*.

For the foregoing reasons the respondent has not shown he is eligible either for asylum or withholding of deportation to El Salvador. The appeal will be dismissed.

**ORDER:** The appeal is dismissed.

*CONCURRING OPINION:* Michael J. Heilman, Board Member

I respectfully concur.

The majority, in its decision, has analyzed the claim of persecution essentially under an ad hoc approach. While I agree with the analysis and the conclusion reached, it seems to me that what is sorely needed in asylum determinations is some form of systematic approach, not a case-by-case analysis which seems to assume that asylum claims should be decided separately as if each claim presented were being examined for the first time, outside of any generally applicable context.

This is why I would propose a second test which could be generally applied in the context of claims made by persons coming from countries in a state of civil war or revolution. This test would consider the claim against the standards applied in determining whether the "political offense exception" should be invoked where an individual's extradition is sought for purposes of criminal prosecution.

In my view, this appeal represents an opportunity to deal with an important issue of a recurring nature. That issue is whether a threat of harm from a guerrilla organization constitutes a threat of persecution, or a threat of some other nature not encompassed by the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102. While there has been much debate about the standard of proof necessary to substantiate a claim of persecution, little, if any attention has been paid to a more central issue: how to identify acts of persecution. In a great number, if not a majority of the asylum appeals presented to this Board, the focus of the application has been on the degree of harm which may be encountered by the applicant. Almost no attention is paid to the context in which that harm arises. There has been a general drift in the adjudication of asylum cases toward a simple and superficial risk analysis, in which the disposition of asylum claims has depended entirely upon whether the applicant has presented a convincing case that he might be harmed if he returned to his native land. Reduced to its most superficial level this risk analysis has reached the point that any harm which may be inflicted by a group with a political agenda is presumed to be per se persecution on account of political opinoin.

A. *The Respondent's Claim Can Also be Tested Against the "Political Offense Exception" to Extradition.*

In this instance the test would be applied to determine whether the threat levied by the guerrillas constitutes a threat of persecution. This is a test which has a long political and legal history, and is a determination which is neutral, factual, and consistent with the political ethic of the United States.

Two determinations will be made. The first is a determination as to whether a state of armed rebellion or civil war exists in the country of claimed persecution. The second determination is whether the act of harm threatened or actually carried out is related to or connected with the armed rebellion. The test in essence focuses on the claimed agent of persecution, on the theory that the act of persecution cannot exist in isolation.

B. *The Value and Utility of Applying This Test.*

A preliminary question which should be addressed at this point is whether it is necessary or useful to interpret the immigration laws relating to asylum consistently with those relating to extradition. It is obvious that they are two distinct bodies of law, and it is clearly understood that decisions in extradition cases and in asylum or withholding of deportation cases under sections 208 and 243(h) of the Act, 8 U.S.C. §§ 1158 and 1253(h) (1982), are not res judicata each to the other.

One substantial benefit of the application of the standards of the "political offense" exception to extradition in considering asylum applications lies in the fact that those standards provide a historically consistent and analytically coherent framework by which to judge acts committed in political struggles, and so to distinguish those that are a consequence of the nature of political struggles, from those which are based on the desire to persecute. The "political offense" standard requires a factual determination to establish the context of the act; whether or not, for instance, a state of rebellion or civil war exists, and whether the act threatened is in furtherance of this objective and is intrinsically related to the nature of the struggle. Once this analysis is applied and the determinations made, then it is possible to conclude whether the act may be characterized as a "political offense."

There are other substantial benefits which this test would bring to the consideration of asylum claims. One clear strength is that it allows a consistent analysis to be applied to all claims arising from a country in a state of armed rebellion or civil war. The test is ideologically neutral, and does not require value judgments as to the legitimacy of the political struggle. It provides a manageable standard, as it allows for fairly straightforward factual determinations of a somewhat limited nature. The test is not over-inclusive, as it does not provide carte blanche approval of all acts which may occur in time of civil war or armed rebellion. And finally, it is a standard which allows an adjudicator to take into account the reality of armed struggles.

The law of extradition in this sense provides a useful analytical structure, from the perspective of examining the activities of the group threatening the harm. This is done under the assumption that persecution cannot exist in a vacuum. If one finds that an individual has a reasonable fear of persecution, then one must find that the group threatening the harm is an agent of persecution. If, however, in examining the activities of the group which threatens the harm, one determines that the threatened act would come

within the "political offense" exception to extradition, then there is powerful reason to find that the threatened act does not constitute persecution.

This reason is the fact that the "political offense" exception has historically been a way of granting legal and political protection, "political asylum," to persons who have committed violent acts in furtherance of a political objective during times of rebellion, revolution, or other armed struggle. In essence, if one were to find that all acts of political violence necessarily constituted persecution, then one would be placed in the awkward position of granting political asylum to those harmed by persons who have historically been granted a form of political asylum themselves.[1]

## C. Assumptions Underlying Application of This Analysis.

The application of this analysis is based on two assumptions, both having a solid basis in logic and in the political and legal history of the United States. The first assumption is that acts of persecution are not protected by international or United States law, and are indeed condemned. The immigration laws of this country, for example, specifically require the exclusion or expulsion of aliens who have committed acts of persecution related to the Nazi Government of Germany. See sections 212(a)(33) and 241(a)(19) of the Act, 8 U.S.C. §§ 1182(a)(33) and 1251(a)(19) (1982), respectively.

### 1. The Nature of Asylum.

It would seem indisputable that the grant of asylum is an expression of fundamental values, among which are the desire to accord protection to the oppressed and to affirmatively promote basic human rights. The United States, for example, in acceding to the Protocol to the United Nations Convention Relating to the Status

[1] Although not directly relevant to the issue at hand, it might be useful to point out that application of this test would not require the United States to grant asylum or withholding of deportation under sections 208 and 243(h) of the Immigration and Nationality Act to persons whose extradition is barred. A recent extradition case which narrowed the political offense exception seems to have been motivated in part by the incorrect assumption that if the exception were applied, the United States would become a "safe haven" for terrorists. Eain v. Wilkes, 641 F.2d 504, 520 (7th Cir. 1981), cert. denied, 454 U.S. 894 (1981). A person whose extradition is denied under this exception is still subject to deportation. He is free to claim persecution, but must show that the punishment he fears for his political offense would be aggravated or heightened because of his political views. Kovac v. INS, 407 F.2d 102 (9th Cir. 1969); Soric v. INS, 346 F.2d 360 (7th Cir. 1965); Matter of Janus and Janek, 12 I&N Dec. 866 (BIA 1968).

of Refugees in 1968 understood that the "protocol is a human rights document," accession to which would convey to the world the traditional concern of the United States "for refugees and for the individual human being which have long been embodied in our laws and consecrated in our traditions." Exec. Rep. No. 14, 90th Cong., 2d Sess. 4 (1968).

Subsequently, in considering legislation which would become in part the Refugee Act of 1980, its chief Senate sponsor, Senator Kennedy, stated that the provisions gave "statutory meaning to our national commitment to human rights and humanitarian concerns." Senator Kennedy further stated that the bill was designed "for the decades to come," and would allow the American people to decide which refugees would be of special concern. In this process, the past would "serve as a guide," as it had previously in the instances in which the United States had responded "to human rights concerns embodied in the Universal Declaration for Human Rights." S. Rep. No. 256, 96th Cong., 1st Sess. 1, 6 (1979).

Similar language was used in considering the counterpart House bill. The Committee on the Judiciary, for instance, stated that by adopting a refugee standard of "special humanitarian concern," the Committee was emphasizing the humanitarian "plight of the refugees themselves," as opposed to national origins or political considerations. The Committee also was of the view that "past history" could be of some guidance in defining the factors which might be considered in offering refuge, among them being the "plight of the refugees, the pattern of human rights violations," and the "likelihood of finding sanctuary elsewhere." H. Rep. No. 608, 96th Cong., 1st Sess. 13 (1979).

### 2. The Nature of the Political Offense Exception.

The second assumption in applying this analysis is that persecution should not be defined in such a way as to squarely conflict with the legal and political history of this country. If, for instance, the Government of the United States has historically accorded both political and legal protection to persons who have engaged in acts identical to those claimed to constitute acts of persecution, then the claim of persecution would have to fail.

While it is possible to consider extradition as a narrow application of one aspect of criminal law, its significance as an expression of political philosophy relevant to asylum law should not be understated. When the Government of the United States refuses the extradition of a person who has committed a murder for political reasons, this is not an act that is carried out lightly. Such a refusal

may severely strain the relations between nations. The refusal only makes sense if it is motivated by adherence to a fairly lofty political tradition: that violence inflicted in time of armed struggle occupies a moral and ethical plane which entitles it to protection. The Government of the United States has recognized and protected from punishment persons who have committed violent acts carried out in furtherance of a political agenda if the acts were committed in time of war, revolution, or armed rebellion. *See Escobedo* v. *United States*, 623 F.2d 1098, 1104 (5th Cir.), *cert. denied*, 449 U.S. 1036 (1980); *Karadzole* v. *Artukovic*, 247 F.2d 198 (9th Cir. 1957).

The protection accorded to individuals carrying out these acts of violence has in fact been characterized as a grant of "political asylum," by the Secretary of State. In a case involving the extradition of four members of a Russian revolutionary group wanted for murder, robbery, and arson, the Secretary of State refused extradition, after the district court had ruled against them. The Secretary stated:

> The Government of the United States finds itself impelled to these conclusions not only by generally accepted rules of international law which forbid the surrender of political fugitives, by the principles of internal jurisprudence, which, proclaimed and acted upon by the courts of this and other countries, declared that "a person acting as one of a number of persons engaged in acts of violence of a political character, with a political object, and as part of the political movement and rising in which he is taking part" is a political offender and *so entitled to an asylum in this country;* and by the long and consistent course of rulings in which the executive branch of this Government has expressly adopted and carried out such laws and principles—but also by the express provision of article III of the Extradition Treaty. . . .

*Matter of K-*, 4 I&N Dec. 108, 115 (C.O. 1950) (quoting *Case of Rudewitz*, IV Hackforth Digest of International Law, 49–50) (emphasis added).

The view that application of the political offense exception is a grant of political asylum has a fairly venerable history. It is generally understood that the "political offense" exception to extradition was developed in Belgium and first enacted into law in that country in 1833:

> The so-called "right of political asylum" was developed during the last century largely under the influence of Belgian practice. Belgium laid down the principle of non-extradition for political offenses in an Extradition Law of the year 1833. This provision had great influence on the development of the law of extradition. Many countries incorporated the Belgian principle into their extradition treaties *verbatim*, or with insignificant variations. Germany was one of those countries; most of the extradition treaties concluded by her rest on that principle so far as the question of political asylum is concerned.

6 Whiteman, M., *Digest of International Law* 801 (Department of State, 1968).

This discussion of the character of the "political offense" exception as constituting a grant of "political asylum" is drawn from an extradition case considered by the Supreme Court of Germany in 1933. This position has also been adopted by the Government of Great Britain. In considering whether to accede to the United Nations Convention on Genocide in 1962, the British Government stated that due to the "breadth and imprecision" of certain articles, relating to the extradition of persons charged with offenses of genocide, it could not accede to the Convention, because to do so would be "a derogation from this country's traditional right to grant political asylum which the Government do not think it right to accept." 6 Whiteman, M., *supra*, at 846.

The magnitude and power of these philosophical underpinnings of the political offense exception have been recognized in a recent decision which forcefully defended that concept. In *Quinn v. Robinson*, 783 F.2d 776, 792-93 (9th Cir. 1986), the court pointed out that the political offense exception is now "almost universally accepted in extradition law," and that the exception

> is premised on a number of justifications. First, its historical development suggests that it is grounded in the belief that individuals have a "right to resort to political activism to foster political change." . . . This justification is consistent with the modern consensus that political crimes have greater legitimacy than common crimes.

These justifications are in turn based on the political histories of the United States, France, and Great Britain, and have been articulated as principles of political philosophy. *Id.* at 792.

The court further stated, as have others before it, that the political offense exception "was designed to protect those engaged in internal or domestic struggles over the form or composition of their own government, including, of course, struggles to displace an occupying power," and to "protect revolutionary activity." *Id.* at 807-08 n.33. In stating these conclusions, the court noted that some courts have favored narrowing the exception because certain "modern revolutionary *tactics* which include violence directed at civilians are not politically 'legitimate.' " (Emphasis in original.) The court found this assumption to contain an "inherent conceptual shortcoming" because it sought to impose on "other nations and cultures our own traditional notions of how internal political struggles should be conducted." *Id.* at 804. The court clearly rejected this view, finding that

> [i]t is understandable that Americans are offended by the tactics used by many of those seeking to change their governments. Often these tactics are employed by persons who do not share our cultural and social values and mores. Sometimes they are employed by those whose views of the nature, importance, or relevance of individual human life differ radically from ours. Nevertheless, it is not our

place to impose our notions of civilized strife on people who are seeking to overthrow the regimes in control of their countries in contexts and circumstances that we have not experienced, and with which we can identify only with the greatest difficulty. It is the fact that the insurgents are seeking to change their governments that makes the political offense exception applicable, not their reasons for wishing to do so or the nature of the acts of the acts by which they hope to accomplish that goal. Politically motivated violence, carried out by dispersed forces, and directed at private sector institutions, structures, or civilians, is often undertaken—like the more organized, better disciplined violence of preceding revolutions—as part of an effort to gain the right to self-government. . . . We believe the tactics that are used in such internal political struggles are simply irrelevant to the question whether the political offense exception is applicable.

*Id.* at 804-05.

Viewed in this light, juxtaposing determinations relating to persecution with those determinations made in applying the political offense exception in extradition cases serves as a logical control, if one assumes that an act of violence cannot be at the same time legitimate and illegitimate. This is particularly the case if one in addition accepts the idea that the asylum provisions and the political offense exception reflect basic views of American society regarding armed political rebellion and also reflect a basic moral or ethical judgment on the nature of acts considered acceptable and unacceptable. If one is tempted to find that someone is a victim of persecution because of violence inflicted during an armed rebellion, then one should also pause to reflect on the reaction one would have to the purported agent of persecution if he in turn were in the United States seeking legal and political protection from the government of the country in which he had committed his act of political violence.[2]

## D. *Asylum and the Political Offense Exception Should be Applied in a Consistent Manner.*

In the face of the protection accorded politically motivated violence, which is considered a legitimate expression of self-determination, regardless of the tactics employed, there is no historical or legal basis to find at the same time that the victims of the violence have been persecuted. Persecution is by definition an illegitimate act, universally condemned. There would appear to be no logic, or historical or legal sense to be found in parallel determinations which would on the one hand find that an individual is a victim of persecution, a totally illegitimate act outside the sphere of protec-

---

[2] The reference to both "legal" and "political" protection is intentional, as extradition may be and has been refused by the Secretary of State after an extradition order by a court has been granted.

tion of universally accepted legal and political principles, while at the same time finding that the agent of the violence is also entitled to legal and political protection.

E. *Application of the Political Offense Exception Test to This Case.*

The act of violence threatened in this instance happens to be identical to the harm actually inflicted by the subjects of the seminal case in United States extradition law, *In re Ezeta*, 62 F. 972 (N.D. Cal. 1894). There, among other offenses charged by the Government of El Salvador, four individuals were charged with multiple murders and bank robbery. After determining that the four individuals had been on the losing side in a revolution in that country, and that they had probably committed most of the offenses alleged, the court invoked the "political exception" clause to the extradition treaty, and denied the extradition request. In so doing the court found that the individuals killed had been persons who had refused to give their assistance to one side of the revolt or the other, an alleged spy, and an officer who had purportedly gone over to the opposition. The crucial question in the court's view was

> whether, upon the facts, it is clear that the man was acting as one of a number of persons engaged in acts of violence of a political character with a political object, and as part of the political movement and rising in which he was taking part.

*Id.* at 999 (quoting the *Castioni Case*, 1 Q.B. 149 (1891)).

The court stated that applying the principle of the *Castioni Case*, "the conclusion follows that the crimes charged here, associated as they are with the actual conflict of armed forces, are of a political nature." *In re Ezeta, supra,* at 999. The court did not reach this conclusion lightly, as it recognized fully that during the revolution, "crimes may have been committed by the contending forces of the most atrocious and inhuman nature." *Id.* at 997. The court also recognized, as had the British courts before it that

> everybody knows there are many acts of a political character done without reason, done against all reason, but at the same time one cannot look too hardly, and weigh in golden scales the acts of men hot in their political excitement. We know that in heat, and in heated blood, men often do things which are against and contrary to reason; but none the less the act of this description may be done for the purpose of furthering and in furtherance of a political rising, even though it is an act which may be deplored and lamented, as even cruel and against all reason, by those who can calmly reflect upon it after the battle is over.

*Id.* at 999 (quoting the *Castioni Case*).

The court also relied on the findings in other extradition cases involving the United States and Mexico and Canada. In those cases it was held that persons who had committed violent offenses in the course of participating in armed uprisings were immune from ex-

tradition. This included a Canadian extradition request for the leader of an armed band of 600 to 1,500 men which had committed arson, robbery, and the murder of an individual who had refused to obey their orders. *Id.* at 1000.

In a recent example directly pertinent to the respondent's situation, one Janelli, who had been a member of a Fascist group carrying out operations against partisan groups in Italy in 1944, deserted, went over to the partisans, and subsequently returned to the Fascists. He was ordered shot by Ficorrilli, whose extradition from Switzerland was sought by Italy in 1951:

> The Federal Tribunal has previously decided that one must regard as a political offense an offense which is the consequence and manifestation of an extraordinary agitation or tension between political parties, and of disturbances which lead the participants to use methods of violence against their opponents, causing disorders and large numbers of crimes of violence; and any act which, even considered in isolation, must be considered to be a consequence of reprisals in a general political uprising and struggle for power, not as the carrying into effect of personal motives and private aims.

> In the present case there was armed conflict between two parties struggling for power, the partisans and the neo-fascists. Recourse was had to violence and to military or pseudomilitary operations . . . .

6 Whiteman, M., *supra*, at 828. Extradition was refused on these grounds.

A third pertinent example of extradition being denied under the political offense exception is found in *Ramos* v. *Diaz*, 179 F. Supp. 459, 462-63 (S.D. Fla. 1959). There, an American court refused the request of the newly installed Cuban Government to turn over two men who had killed a prisoner. The two men had been military members of the victorious Cuban revolutionary forces who had been assigned to guard prisoners during the days the new government was consolidating its power:

> At the time of the shooting neither Cruzata nor Diaz knew the prisoner who was shot. It was a standing order of the Castro army that anyone guarding a prisoner who permitted him to escape was himself subject to summary execution. At the time of the shooting there existed much turmoil and excitement with remnants of the Batista regime fighting with the victorious Castro troops and arrests and executions were commonplace.

> . . . .

> [T]he Defendants were members of a revolutionary movement. . . . [T]he crime allegedly committed by them took place in the early days of the victory of the revolutionary forces, and as a part of a political uprising and disturbance. The Defendants bore no ill will or malice toward their victim, who was just one of the many political prisoners captured in furtherance of the political rising. The Defendants were under the command of revolutionary forces engaged in mopping up operations as a part of the revolution.

*Id.* at 463.

These decisions are consistent with the views expressed in *Quinn* v. *Robinson, supra,* that revolutionary violence, whether aimed at civilian or military targets, is protected activity. As the court stated:

The "incidental to" component, like the incidence test as a whole, must be applied in an objective, nonjudgmental manner. It is for the revolutionaries, not the courts, to determine what tactics may help further their chances of bringing down or changing the government. All that the courts should do is determine whether the conduct is related to or connected with the insurgent activity. It is clear that various "non-military" offenses, including acts as disparate as stealing food to sustain the combatants, killing to avoid disclosure of strategies, or killing simply to avoid capture, may be incidental to or in furtherance of an uprising. To conclude that attacks on the military are protected by the exception, but that attacks on private sector institutions and civilians are not, ignores the nature and purpose of the test we apply, as well as the realities of contemporary domestic revolutionary struggles.

*Id.* at 810.

It is clear that the "realities of contemporary struggles" may be rather grim.[3] In describing, for example, the Algerian war for independence, one historian has estimated that about 80,000 Muslim civilians were killed by the Algerian nationalist forces, as opposed to approximately 3,000 European civilians. Both the European and Muslim organizations engaged in widespread violence which was aimed at achieving their political objectives. The Europeans, particularly, the Secret Army Organization ("OAS") set out to terrorize the Muslim population by bombings and executions, as did the Muslim nationalists against the Europeans. Both sides attacked without mercy persons they suspected of aiding their opponents, or even persons they simply suspected of insufficient enthusiasm for their cause. At one point, the OAS killed postmen, pharmacists, railway workers, flower vendors, and maids, each on different days of the week. Toward the end of the war, the OAS adopted a "scorched earth" strategy, blowing up or burning down libraries,

---

[3] As to whether this type of activity is "contemporary," it is instructive to consider the description offered in 1890 by a Colombian official of the nature of revolutions in South America:

In the revolutions, as we conduct them in our countries, the common offenses are necessarily mixed up with the political in many cases. A revolutionist has no resources. My distinguished colleague General Caamano [of Ecuador] knows how we carry on wars. A revolutionist needs horses for moving, beef to feed his troops, etc.; and since he does not go into the public markets to purchase those horses and that beef, nor the arms and saddles to mount and equip his forces, he takes them from the first pasture or shop he finds at hand. This is called robbery everywhere, and is a common offense in time of peace, but in time of war it is a circumstance closely allied to the manner of waging it.

*In re Ezeta, supra,* at 1000 (quoting International American Conference, vol. 2, at 615).

hospitals, schools, laboratories, public buildings, and economic targets. In a statement that could have, for the most part, been echoed by the nationalist forces, a leader of the OAS said:

> The overall target was to paralyze the powers that be and make it impossible for them to exercise authority. Brutal actions will be generalized over the whole territory. They will aim at influential personalities of the Communist Party, at works of art, and all that represents the exercise of authority, in a manner to lead towards the maximum of general insecurity and the total paralysis of the country.

Horne, A., *A Savage War of Peace* 135, 259-60, 516-17, 530 (Viking Press, 1978).

The Spanish Civil War of 1936-1939 also offers an object lesson in the use of violence on a grand scale, by all parties to the struggle, anarchists, communists, socialists, and falangists, alike. Part of Nationalist Spain in July 1936, during the war, has been described as follows:

> All political parties which had supported the Popular Front were banned. Political life ceased. Even the old right-wing and Center parties, including the CEDA, vanished. The only active political groups were the Falange and the Carlists, and these were "movements" rather than parties. The casas del pueblo and the left-wing newspaper offices were closed down. Strikes were made punishable by death. Private rail and road movement was banned. Throughout nationalist Spain, freemasons, members of Popular Front parties, members of trade unions, and, in some areas, everyone who had even voted for the Popular Front in the elections of February, were arrested and many shot.
>
> . . . These atrocities had a special purpose. Though the rebels were determined and often well-armed, they were few in number. In places such as Seville and Granada, the large working-class population had to be terrified into acquiescence of the new order before the nationalist commanders could sleep peaceably in their beds. Hence, not only did the rebels act ruthlessly toward their enemies, but they had to act openly, and expose the bodies of those whom they killed to public gaze.
>
> The repression was an act of policy, decided upon by a group of men who knew their original plans had gone awry. . . . "It is necessary to spread an atmosphere of terror. We have to create the impression of mastery. . . ."

Thomas, H., *The Spanish Civil War* 258-60 (Harper and Row, 3d ed. 1977).

It is of course not really necessary to look beyond the United States for an example of the violence and brutality which is generated in a revolutionary war. The following account has been offered of the patriots' activities during the American Revolution in March 1776 and after:

> Triumphant, the patriots rushed into the city [Boston] that had been the center and symbol of the rebellion. Now it was the Tory property that went under the auctioneer's hammer. Now it was Tory homes that sometimes went up in flames while the owners were stripped, tarred, feathered and ridden out of town on a rail. No one hates more than hostile brothers, and even the British themselves were not hated so venomously as were those Loyalists whom Howe was forced to leave behind.

> From Maine to South Carolina they were lashed through the streets, pelted with rotten eggs or forced to go down on their knees to damn the King and his ministers. . . . Washington himself wanted the more notorious Tories hung as an example to the rest, and Governor Livingston of New Jersey said: "A Tory is an incorrigible animal: And nothing but the Extinction of Life will extinguish his malevolence against liberty." Before the war was over the patriots were forcing all secret Tories to declare themselves by imposing oaths of loyalty to the United States. Those who refused were fined, imprisoned, deprived of civil rights or, as the new states seized upon this handy means of raising revenue, dispossessed.

1 Leckie, R., *The Wars of America* 134–35 (Harper and Row, 1968).

When the British in turn marched to New York that same year, the favor was returned:

> The moment the redcoats marched into the town at the foot of Manhattan Island, they were overwhelmed by throngs of weeping, shouting Loyalists. . . .

> Then the witch hunt began. Rebels or suspected rebels were rounded up, especially those who had been over-heard to vow that they would set fire to the town rather than allow the British to occupy it.

> In the early morning of September 21, by accident or design—history does not know—New York was burning. By the time the alarm was given the fire was out of control. . . . Meanwhile, mob frenzy had overcome the Tories. They seized suspects and strung them up without trial. Some were even thrown screaming into the flames.

*Id.* at 148–49.

The British also made effective use of their Indian allies. In 1778:

> On July 4—to mock American independence—Colonel Sir John Butler struck at the Wyoming Valley in Pennsylvania. Hundreds perished. Men were burnt at the stake or thrown on beds of coals and held down with pitchforks while their horrified families were forced to witness their torment. Others were placed in a circle while a half-breed squaw called Queen Esther danced chanting around them to chop off their heads. Soon the entire frontier was in flames, with Washington unable to come to its rescue.

*Id.* at 187.

That is not to say, however, that revenge was not eventually taken upon the British Indian allies. In the summer of 1779, Washington sent an army to destroy Iroquois Indian towns. Forty were destroyed and crops and orchards destroyed. "In the cruel winter of 1779–80 which followed, hundreds of Indian families starved to death." *Id.* at 190.

It would be hard to deny that these accounts of civil war or revolution reveal a great deal of brutality and ruthlessness. It would be equally hard to simply characterize these upheavals as vast acts of persecution; certainly in the American example, neither history, nor tradition, cast either General Howe or General Washington as men who had engaged in the persecution of their opponents. Yet it is obvious that they each directed and led men to kill their political opponents and destroy their property. Unless one is to engage in

530

total historical revisionism, there is absolutely no basis to conclude that Howe and Washington committed acts of persecution. Rather, they directed acts altogether typical of civil war and in their view, necessary, to achieve their political and military objectives.

In the case presently under consideration, there is no reason to conclude that the respondent is anything other than a victim of civil war, or that the guerrillas in El Salvador are conducting themselves any differently than guerrillas have conducted themselves throughout history. The guerrillas in El Salvador have set out to overthrow the existing government and social order.[4] They have chosen to achieve their objective in great part by force of arms and by forcing a sometimes reluctant population to provide them with the resources they need to sustain their struggle. Among the methods they have chosen is the forced recruitment of laborers and combatants. Since they cannot afford to allow persons to desert their cause with impunity, they have imposed a drastic form of military discipline on deserters.

### F. Conclusion

In applying the political offense exception test to this application for asylum, then, it is clear that the first element exists: a guerrilla war is occurring in El Salvador. It is also clear that the guerrilla organization from which the respondent deserted is an active participant in this war. This is evident from the respondent's testimony and from the Department of State report on conditions in El Salvador.

As to the second element, whether the threat of death for desertion is an act "incidental to" that war, we may rely again on information indicating that the guerrillas forcibly recruit persons to their armed forces, both as combatants and as persons who provide labor of various types. Again, we can rely on the respondent's testimony and the Department of State report for this information. We may also draw on historical information relating to revolutionary struggles in general. If the guerrillas need to forcibly recruit persons, then it is fair to assume, given the nature of the struggle in El Salvador, and of guerrilla struggles in general, that the guerrillas cannot tolerate desertion from their ranks. If this were to happen, they could experience such a loss of vital military or logistical support that their ability to engage in military operations would be severely affected. Because of this, and because the guer-

---

[4] An objective which has been recognized and protected under the political offense exception, regardless of what one may think of the ultimate political and social goals of the Salvadoran guerrillas. See Quinn v. Robinson, supra, at 807–08 n.33.

rilla organization is a military organization by nature, it must exert strong discipline over its members, voluntary or not, and it can effectively use the threat of severe punishment, even death, to maintain the stability of its organization. As both Swiss and United States courts have found, the infliction of severe punishment for desertion is an act almost necessarily inherent in the nature of a revolutionary or civil struggle.

In total, then, applying the standards of the political offense exception, the threat of death for desertion faced by the respondent does not constitute an act of persecution, but rather an act of armed political struggle. Politically motivated though the threat may be, in the end analysis, it is not a threat of harm for which asylum should be granted.

For this reason also, I would dismiss the appeal.